IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF IOWA
EASTERN DUBUQUE DIVISION

UNITED STATES OF AMERICA,

       Plaintiff,

   vs.                          No. CR21-1009-CJW

EMILY ANN NELSON,             TRANSCRIPT OF
                              DETENTION HEARING

       Defendant.
_____/


       The Detention Hearing held before the Honorable
Mark A. Roberts, Magistrate Judge of the United States
District Court for the Northern District of Iowa, at the
Federal Courthouse, 111 Seventh Avenue Southeast, Cedar
Rapids, Iowa, February 11, 2021, commencing at 1:58 p.m.


APPEARANCES

For the Plaintiff:    DAN CHATHAM, ESQ.
                     Assistant United States Attorney
                     111 Seventh Avenue Southeast
                     Cedar Rapids, IA 52401

For the Defendant:    MARK C. MEYER, ESQ.
                     Kinnamon, Kinnamon, Russo & Meyer
                     Suite 425
                     425 Second Street Southeast
                     Cedar Rapids, IA  52401

Also present:        Matt Sturdevant, U.S. Probation

Transcribed from      Shelly Semmler, RDR, CRR
digital recording by: 320 Sixth Street
                     Sioux City, IA  51101
                     (712) 233-3846

1    (The following transcript was prepared from an audio

2  recording.)

3                              *  *  *  *

4        THE COURT:  The matter before the Court is

5  United States versus Emily Ann Nelson, Number 21-CR-1009.

6  The matter comes on for a detention hearing.  First of

7  all, can everybody hear me?

8        MR. CHATHAM:  Yes, Your Honor.

9        MR. MEYER:  Yes, Your Honor.

10        THE COURT:  Mr. Meyer, is there any objection

11  by the defendant to me appearing by video for the

12  purposes of our hearing this afternoon?

13        MR. MEYER:  No, Your Honor, none at all.

14        THE COURT:  Any objection from the government?

15        MR. CHATHAM:  No, Your Honor.

16        THE COURT:  We're here for a detention hearing,

17  as I mentioned, and the government has the burden.  And

18  you may proceed, Mr. Chatham.

19        MR. CHATHAM:  Thank you, Your Honor.  First of

20  all, the United States would ask the Court to consider

21  the information contained in the pretrial services report

22  which was filed at document number 12.

23        THE COURT:  Any objection?

24        MR. MEYER:  No, Your Honor.

25        THE COURT:  I'll let the parties know that I

1   have reviewed that in detail, and I will take formal

2   notice of it.

3           MR. CHATHAM:  The United States calls Chad

4   Leitzen.

5           THE COURT:  Mr. Leitzen, if you could please

6   raise your right hand, and I'll have you testify right at

7   that table so I can see you on the video.

8           CHAD LEITZEN, PLAINTIFF'S WITNESS, SWORN

9           THE COURT:  Please be seated.

10          THE WITNESS:  Do you want mask on or off?

11          THE COURT:  That's up to you, officer, or I

12  suppose Mr. Chatham who's sitting right next to you, but

13  you don't have to take it off for my benefit.

14          MR. CHATHAM:  We can leave them on is fine.

15                      DIRECT EXAMINATION

16  BY MR. CHATHAM:

17  Q.   Would you please state your name, and spell your

18  last for the record.

19  A.   Chad Leitzen, L-e-i-t-z-e-n.

20  Q.   How are you employed?

21  A.   I am a police officer with the city of Dubuque

22  currently assigned as an investigator with the Dubuque

23  Drug Task Force.

24  Q.   And are you the case agent in the case of United

25  States of America versus Emily Ann Nelson?

1    A.    Yes, I am.

2    Q.    Are you familiar with the defendant, Emily Nelson?

3    A.    Yes.

4    Q.    How long have you been familiar with the defendant?

5    A.    I've been familiar with Ms. Nelson since

6    approximately 2016.

7    Q.    And in what context did you get to know the

8    defendant?

9    A.    I dealt with Miss Nelson on several occasions

10   throughout the past four and a half years including

11   stopping her on a traffic stop and taking drugs and drug

12   paraphernalia off of her as -- and also working with her

13   as a confidential informant.

14   Q.    During your time getting to know Ms. Nelson, the

15   defendant here, have you known her to be a drug user?

16   A.    Yes.

17   Q.    What drugs?

18   A.    Typically heroin.

19   Q.    And in your experience is she someone who uses

20   heroin regularly?

21   A.    Yes.

22   Q.    And can you describe your understanding of her

23   function -- of how she's functioned in the heroin world

24   in Dubuque based on your experience and conversations

25   with her.

1  A.    She is both a middler of drug deals, meaning she

2  gets drugs for other people and in doing so takes a

3  portion of those drugs or gets money for doing that, and

4  she is also a low-level drug dealer according to some

5  other witnesses that I've spoken to as well as comments

6  she's made on recordings.

7  Q.    Now, did -- was there a particular incident that --

8  in late July of 2020 where Ms. Nelson came to the

9  attention of the Dubuque Drug Task Force?

10 A.    Yes.

11 Q.    And what incident was that?

12 A.    That was the overdose of John Walgren.

13 Q.    And is John Walgren someone who is also familiar to

14 you?

15 A.    Yes.

16 Q.    And is it your understanding that he's a somewhat

17 long-time user of heroin?

18 A.    That's correct.

19 Q.    Now, you said that Mr. Walgren suspected -- was

20 suspected to have overdosed?

21 A.    That's correct.

22 Q.    Can you tell the Court how that suspected overdose

23 came to the attention of law enforcement?

24 A.    His girlfriend, Brittani Stoney, called dispatch on

25 the early morning hours of July 29, 2020, advising that

1  her boyfriend had overdosed, and law enforcement as well

2  as fire department personnel responded to the scene for

3  that report.

4  Q.   Do you recall about what time that call came in?

5  A.   It came in at 2:54 -- approximately 2:54 a.m.

6  Q.   That's on July 29?

7  A.   Correct.

8  Q.   And how long was it before first responders were on

9  the scene?

10  A.   It was approximately five to six minutes.

11  Q.   And what happened when the first responders arrived?

12  A.   First responders began assisting Mr. Walgren with

13  ventilations by using a bag valve mask since he was not

14  breathing well and also administered NARCAN to

15  Mr. Walgren.

16  Q.   What is NARCAN?

17  A.   NARCAN is an opioid antagonist, so it reverses the

18  effects of an opioid overdose.

19  Q.   And what was Mr. Walgren's condition at the time

20  that first responders found him?

21  A.   He was unconscious and cyanotic, meaning turning

22  blue, and he had very shallow breaths and was not -- was

23  not breathing well.

24  Q.   And after the paramedics administered that NARCAN,

25  did Mr. Walgren's condition change?

1    A.    Yes, it did.

2    Q.    And can you describe what happened?

3    A.    Within just a few minutes of the administration of

4    NARCAN, Mr. Walgren began breathing on his own without

5    the assistance of ventilations.  He also became conscious

6    again and within just a few short minutes was actually

7    able to walk himself to the -- to the ambulance to be

8    transported to the hospital.

9    Q.    Did Mr. Walgren agree to be interviewed about the

10   circumstances of him becoming unconscious that night?

11   A.    Yes.

12   Q.    And what did he -- and did you personally interview

13   Mr. Walgren?

14   A.    I did.

15   Q.    And what did he say to you?

16   A.    He advised me that he had purchased heroin from

17   Emily Nelson a short time earlier and used that heroin

18   which caused him to overdose.

19   Q.    And did he describe generally where that transaction

20   had occurred?

21   A.    Yes, he gave me an exact description of the events

22   that took place that evening or that early morning.

23   Q.    Did he state how he had gotten ahold of the

24   defendant?

25   A.    Yes.  He stated he contacted her via Facebook

1   Messenger.

2   Q.   Did he provide you his phone and consent to search

3   his phone?

4   A.   Yes, he did.

5   Q.   Did -- during your search of that phone, did you

6   locate any messages that tended to corroborate

7   Mr. Walgren stating that he had met with the defendant

8   for a drug deal that day?

9   A.   Yes.

10  Q.   And what -- were there a lot of messages?

11  A.   Yes, there were several messages that were clearly

12  messages for the two intending to meet up and then the

13  location where they were to meet and then several

14  messages advising that Mr. Walgren was on his way and he

15  was there wondering where she was, and the two eventually

16  met according to the text messages at approximately 2:00

17  a.m.

18  Q.   And could you tell from the messages how much heroin

19  that Mr. Walgren was attempting to obtain from the

20  defendant?

21  A.   I believe it was a half a gram.

22  Q.   Did you take any other steps to corroborate the

23  information that Mr. Walgren had provided about meeting

24  with the defendant?

25  A.   Yes.   I read through all of the Facebook Messenger

1  messages and got the complete timeline of where he picked

2  her up and where he had advised they went to and where he

3  dropped her back off at, and I used the timeline from

4  Facebook Messenger, and I viewed the city of Dubuque

5  traffic camera video, and it corroborated exactly with

6  the timeline laid out by Facebook Messenger.

7  Q.   And when you say corroborated, does that mean that

8  you were able to observe Mr. Walgren or his vehicle in

9  the locations that he had described?

10  A.   Correct.

11  Q.   And were you able to see whether the defendant was

12  present during any of those times where you could see

13  that vehicle?

14  A.   Yes.

15  Q.   And can you describe for the Court how you were able

16  to determine the defendant was present?

17  A.   I was able to observe a female walk to Mr. -- to the

18  area where Mr. Walgren's car was at approximately 2:01

19  a.m. on July 29, and then they had driven directly to the

20  area of the 3100 block of White Street which is -- and

21  they parked behind a building which is just off of

22  traffic camera video.  And they parked there

23  approximately 2:08, and then at 2:09 that same white

24  female walks across -- northbound across 32nd Street to

25  the intersection of 32nd and Jackson, and then she walks

1  northbound on Jackson out of sight, and then she

2  reemerges at the intersection of 32nd and Jackson at

3  approximately 2:21 a.m. and walks southbound across 32nd

4  back toward where the vehicle was parked that Mr. Walgren

5  was in.  And during that walk back to Mr. Walgren's

6  vehicle, I could actually see her face on the traffic

7  camera video when it's -- when it's lit up by a -- an

8  ambient street light.

9  Q.   And at the time you viewed these traffic camera

10 videos, you were familiar with the defendant?

11 A.   Correct.

12 Q.   So were there any additional steps taken by law

13 enforcement to try to confirm the sort of sequence of

14 events by setting up additional meetings with Ms. Nelson?

15 A.   Yes.

16 Q.   And can you describe for the Court what efforts were

17 made in that regard?

18 A.   Approximately 12 hours after this overdose occurred,

19 during the afternoon hours of January 29, I spoke with

20 Mr. Walgren, and he met me at the -- at my office, and he

21 again tried to contact Miss Nelson at that time to try to

22 mimic -- try to set up another deal where he purchased

23 heroin from her which would mimic what happened earlier

24 that morning.  However, at that time she did not answer

25 the messages, so that attempt was aborted, and the

1  following day in the evening hours of July 30, we
2  attempted the same thing again.
3  Q.    And did she respond to those messages?
4  A.    She did.
5  Q.    And so what did the Dubuque Drug Task Force do at
6  that time?
7  A.    Mr. Walgren came to the drug task force office, and
8  an undercover purchase for $120 worth of heroin was set
9  up at that time, and his -- his person and vehicle were
10 searched for any and all forms of contraband with
11 negative results, and then he was provided with a
12 recording -- a recording device and body wire and also
13 the $120 in order for the drug deal to take place.  And
14 then he was able to eventually meet up with Emily Nelson
15 during the early morning hours of July 31.
16 Q.    Was Mr. Walgren alone during this deal?
17 A.    No.
18 Q.    Who else was with him?
19 A.    His girlfriend, Brittani Stoney, was also with him.
20 Q.    And why was that?
21 A.    Because she had been with him on the early morning
22 hours of July 29 when -- when he purchased the drugs from
23 Emily Nelson that he overdosed on, so we wanted to make
24 it as much as possible exactly what had occurred two days
25 earlier.

1  Q.   Now, had Mr. Walgren previously been involved with

2  the Dubuque Drug Task Force?

3  A.   Yes.

4  Q.   Had he previously worked as a confidential

5  informant?

6  A.   Yes.

7  Q.   And had he previously, well, for lack of a better

8  word, stolen drugs from a buy?

9  A.   Yes.

10 Q.   And can you describe for the Court generally what

11 happened during that instance?

12 A.   In April of 2017 Mr. Walgren had set up -- or I had

13 contacted Mr. Walgren to set up an undercover purchase of

14 heroin from one of our local drug dealers.  And he agreed

15 to do so.  However, unbeknownst to me at the time, he had

16 contacted the drug dealer ahead of time and asked the

17 drug dealer to split the amount of drugs that he was

18 going to be purchasing into two separate bags.

19      Mr. Walgren then met with me and was given the money

20 to purchase the drugs.  He then went into the apartment

21 building and purchased the drugs from the drug dealer and

22 returned to the drug task force office and handed me the

23 one bag of drugs that we were expecting to have purchased

24 from the drug dealer.  However, when he was exiting the

25 building, he actually took that second bag and dropped it

1  in the hallway on the steps and returned for it later

2  without my knowledge at the time.  I didn't find out

3  until a search warrant was conducted several days later

4  at the drug dealer's house and I found that text message

5  chain in the drug dealer's phone confirming what had

6  actually happened.

7  Q.   Now, based on that history with Mr. Walgren, were

8  you inclined to take extra precautions when -- or be

9  extra careful when dealing with him as a CI in this

10  instance?

11  A.   Yes.

12  Q.   Is that why -- one of the reasons why Ms. Stoney was

13  also involved in this deal?

14  A.   Correct.

15  Q.   So based on -- so what you've set out here, did --

16  the defendant had some contact then with Ms. Nelson

17  leading into the 31st?

18  A.   Yes.  Mr. Walgren had contact with her.

19  Q.   Excuse me.  Mr. Walgren.  And so what happened then

20  at that point after the communications?

21  A.    Mr. Walgren and Miss Stoney picked Ms. --

22  Miss Nelson up in the area of the 600 block of University

23  Avenue.  And they were directed to drive to the area of

24  the 3100 block of White Street where they had parked 2

25  nights earlier.  And prior to doing that, though,

1  Miss Nelson asked him to stop at a gas station so she

2  could use the bathroom which is right at the intersection

3  just a couple of blocks away.  And once she returned to

4  the vehicle, they drove directly to the 3100 block of

5  White Street and parked.  And at that time Miss Stoney

6  handed Miss Nelson the $120 so she could go purchase the

7  drugs from her drug dealer.  And Miss Nelson disappeared

8  into the night and never returned with money or drugs.

9  Q.   And so how long did law enforcement wait in that --

10  that evening before finally calling it off?

11  A.   At least an hour, probably between an hour and an

12  hour and a half.

13  Q.   Were there any communications with the defendant

14  during that hour, hour and a half between Mr. Walgren and

15  the defendant?

16  A.   Yes, several communications between the two.

17  Q.   Any indication that she was not going to return in

18  those communications?

19  A.   No.  She had advised that there was a problem with

20  getting the drugs that Mr. Walgren wanted.  She stated

21  there was -- she was able to get methamphetamine but not

22  heroin, and it seemed like she was making up several

23  excuses as to why she could not return with any types of

24  drugs at all, and eventually she just stopped responding

25  altogether.  And once -- once we were no longer able to

1  get her to respond over the course of several minutes, we

2  decided to call off the undercover operation.

3  Q.   Did law enforcement ever recover the $120 that had

4  been given to the defendant?

5  A.   No.

6  Q.   I want to back up for just a second.  On the night

7  of Mr. Walgren's overdose, was -- was there a search

8  actually done at the apartment after the overdose?

9  A.   Yes.

10  Q.   And was there any drug paraphernalia found, drugs or

11  drug paraphernalia found, in the apartment?

12  A.   Yes.

13  Q.   And specifically with respect to heroin, was there

14  anything found that would have been consistent with use

15  of purported heroin?

16  A.   Yes.  On the nightstand right next to the bed where

17  Mr. Walgren was found unconscious, there was a plastic

18  bag with -- with a powdery residue inside of it as well

19  as a syringe which Miss Stoney had advised was in

20  Mr. Walgren's hand when she found him unconscious, and

21  she put it on the nightstand.

22  Q.   Was there also a spoon located?

23  A.   Yes.

24  Q.   And is that commonly used to inject heroin?

25  A.   It's used to prepare the heroin to be drawn up into

1  the syringe so it can be injected, yes.

2  Q.    And did it appear that this spoon had been used in

3  that manner?

4  A.    Yes.

5  Q.    So was the spoon -- were the spoon and the baggie

6  containing this substance further sent to the DCI

7  laboratory?

8  A.    Yes.

9  Q.    And what about the syringe?

10 A.    The syringe itself was not sent because the DCI lab

11 does not accept sharps, so a syringe rinse was done on

12 the syringe, and that is where water is drawn up into the

13 syringe and then squeezed out into a small plastic

14 evidence container, and that liquid that came from inside

15 of the syringe is then sent to the DCI lab for analysis.

16 Q.    Have you received results of any testing of those

17 items?

18 A.    Yes.

19 Q.    With respect to the purported heroin that was in the

20 baggie, what did that -- what were the results of that

21 testing?

22 A.    It tested positive for -- or the findings were

23 fentanyl and insufficient for identification.

24 Q.    And what about the spoon?

25 A.    Also fentanyl and insufficient for identification.

1  Q.   And how about the syringe rinse liquid that you've

2  described?

3  A.   That was insufficient for identification.

4  Q.   Do you know what that designation, "insufficient for

5  identification," means when received on a DCI lab report?

6  A.   My understanding is that there's not enough of any

7  substance present for them to be able to identify what

8  the -- what the substance is.

9  Q.   So are there -- to your understanding are there

10 particular cutoff levels at which the DCI laboratory will

11 report something as being in a particular sample?

12 A.   Yes.

13 Q.   And so if something doesn't meet the cutoff level,

14 that might be reported out as insufficient for

15 identification?

16 A.   That's correct.

17 Q.   Now, after this July 30 incident where the defendant

18 took the money and didn't come back, were there

19 additional attempts made by Mr. Walgren to set up a buy

20 with the defendant?

21 A.   Yes.

22 Q.   And over how long a period of time are we talking

23 that those attempts occurred?

24 A.   They were almost daily from July 31 up until August

25 13 when she finally responded and agreed to meet.

1  Mr. Walgren had tried several times within that two-week

2  period to contact Ms. Walgren (sic) and set up another

3  undercover deal at my request.

4  Q.   And so when did the -- when did the defendant

5  finally reach back out?

6  A.   On August 13.

7  Q.   And at that time did the task force attempt to set

8  up a controlled buy?

9  A.   Yes.

10 Q.   And can you describe for the Court what happened or

11 how that controlled buy was set up?

12 A.   I met with Mr. Walgren, and the same precautionary

13 measures were administered that we use for all controlled

14 buys where he was searched and his vehicle was searched.

15 He was then outfitted with a body wire recording device

16 and provided with a hundred dollars in preserialized

17 United States currency, and then numerous drug task force

18 and police surveillance units were employed in

19 maintaining a visual surveillance on Mr. Walgren's

20 vehicle at all times.

21 Q.   Now, you described the last time that an attempt was

22 made that Mr. Walgren's girlfriend was also present

23 during the attempted controlled buy.  Was that the case

24 on the August 13 attempted controlled buy?

25 A.   No.

1  Q.    And so this was just Mr. Walgren himself?

2  A.    Correct.

3  Q.    So what happened then after those precautionary

4  measures were taken?

5  A.    Mr. Walgren drove to Durango, Iowa, which is about

6  five minutes north of Dubuque, and picked up Miss Nelson

7  in a parking lot at a bar in Durango and transported her

8  back to Dubuque.

9  Q.    Now, was Mr. Walgren equipped with a video and audio

10 recorder?

11 A.    Yes.

12 Q.    And so have you reviewed the video of that

13 encounter?

14 A.    I have.

15 Q.    And are you able to see who it was that Mr. Walgren

16 met with that day?

17 A.    Yes, it was Emily Nelson.

18 Q.    So after they went to Durango and came back, what

19 happened next?

20 A.    Ms. Nelson advised Mr. Walgren that he needed to

21 drive her to her house which we knew to be 1455 Main

22 Street because she wanted to pick up some money in order

23 to be able to get drugs for herself at the same time that

24 she was getting drugs for Mr. Walgren, though he drove

25 her directly to the intersection of 15th and Main which

1 is a half a block away from her apartment, and he parked

2 in a parking lot, and she got out and walked towards her

3 apartment.

4 Q.   And did she go inside?

5 A.   Yes.

6 Q.   How long was she inside?

7 A.   She was gone for approximately four or five minutes.

8 Q.   And then what happened next?

9 A.   She returned to Mr. Walgren's vehicle and directed

10 him to go to the same place as before I believe is the

11 question he asked.  And at that time they talked about

12 where he would park, and he told her -- he had mentioned

13 parking behind the auto parts store on White Street which

14 is where they -- where they agreed he should park.

15 Q.   At any point during this conversation between the

16 defendant and Mr. Walgren, did they acknowledge the prior

17 incident where she had taken off with the money?

18 A.   There was -- there was mention of him not -- not

19 trusting her with money once they arrived at the location

20 because once they arrived and parked on White Street,

21 prior to her getting out of the vehicle, she asked

22 Mr. Walgren for his money, and he told her that he could

23 not give her the money until he had drugs first because

24 of what happened last time.

25 Q.   And so what did the defendant agree to do then based

1  on that conversation?

2  A.   She stated that she was just going to go to her

3  dealer and get her own drugs then rather than taking

4  Mr. Walgren's money to buy him drugs, and at that time

5  Mr. Walgren asked her if he could just buy a little bit

6  of what she got from her purchase, and she stated that he

7  could.

8  Q.   So what happened next?

9  A.   Ms. Nelson exited Mr. Walgren's vehicle and while

10 under surveillance walked directly to the back door of 95

11 Milwaukee Street, and she went inside, and she was in

12 there for approximately three minutes and then returned

13 directly to Mr. Walgren's vehicle and had a bag of drugs

14 on her at that time.

15 Q.   And how do you know she had a bag of drugs on her at

16 that time?

17 A.   She had confirmed with him that she had gotten what

18 she was after and also that she needed to get high at

19 that time, so she wanted to take a shot, and she asked

20 Mr. Walgren if he wanted a shot as well.  And he stated

21 not at that time but had agreed to give her $20 for a

22 shot.  She -- Ms. Nelson stated that she had cleans which

23 she was referring to clean needles, and she then reached

24 into her bra and removed two syringes from that area, and

25 she began preparing the suspected heroin that she had

1   purchased for injection stating that she needed to get

2   high and asked Mr. Walgren to drive to a safe place.  And

3   they ended up driving about five or six blocks south and

4   parking in an alley east -- I believe it was east of the

5   2500 block of Jackson if I'm not mistaken, east or west,

6   but they were parked in an alley off of Jackson Street.

7   And we could see on the -- on the body wire that she was

8   preparing the drugs to be injected, she was preparing

9   them in the spoon, and it was at that time that Sergeant

10  Pape who's the director of the drug task force advised

11  that we needed to stop the undercover operation at that

12  point and move in to make the arrest, we couldn't let her

13  use because of the extreme risk.  And as officers were

14  moving in, you could actually see her pull a hair tie up

15  on to her forearm to help expose the veins.  And as

16  officers were moving in, she actually did inject the

17  needle into her hand and plunge it just prior to officers

18  pulling her out of the vehicle.  And then she was -- she

19  was taken into custody at that point.

20  Q.   Was the vehicle searched?

21  A.   Yes.

22  Q.   And were there any drugs found in the vehicle at

23  that time?

24  A.   Yes.

25  Q.   Any drug paraphernalia?

1   A.   Yes.

2   Q.   Can you describe for the Court what was found and

3   where?

4   A.   On the passenger side floorboard there was a small

5   plastic bag with a small amount of a chunky -- like a

6   tan, chunky substance in it that was suspected to be

7   heroin.  There was also a spoon with a -- with a cotton

8   ball in it, and right along the side of the -- the right

9   side of the passenger seat between the passenger seat and

10  the door there was a used syringe, and in -- on the

11  passenger seat there's a -- there's a small void or a

12  little gap between the cushions.  Like there's a front

13  and a back cushion with a small void between the two.

14  And down in that void was a second syringe that appeared

15  to be unused.

16  Q.   And now, is that the seat that Ms. Nelson was

17  encountered in by police?

18  A.   Yes.

19  Q.   Were there any other drugs found in the vehicle?

20  A.   No.

21  Q.   Was Mr. Walgren searched after this incident?

22  A.   Yes.

23  Q.   Any drugs found on his person?

24  A.   No.

25  Q.   Was the substance in the baggie that was found in

1  the car sent to the DCI laboratory?

2  A.    Yes.

3  Q.    And what were the results, if any, of the testing?

4  A.    It was the finding for fentanyl, insufficient for

5  identification, and instrumentally consistent with

6  acetaminophen.

7  Q.    And how about the metal spoon?  Was that also sent

8  to the DCI laboratory?

9  A.    Yes.

10  Q.    And was it tested?

11  A.    Yes.

12  Q.    Any findings there?

13  A.    Those findings were also fentanyl, insufficient for

14  identification, and instrumentally consistent with

15  acetaminophen.

16  Q.    And was there a syringe rinse done of the syringe

17  that appeared to have been used?

18  A.    Yes.

19  Q.    And was that liquid sent to the laboratory and

20  tested?

21  A.    Yes.

22  Q.    What were the results of that testing?

23  A.    That was insufficient for identification.

24  Q.    Was it insufficient for identification or no

25  controlled substance found?

1    A.    Yes, that's correct.    That was no controlled

2    substance found.    That's correct.

3    Q.    So at the time the defendant was taken into custody,

4    was she read her Miranda rights?

5    A.    Yes.

6    Q.    And did -- did you actually question her?

7    A.    Yes.

8    Q.    Did she make any statements about what she was doing

9    in the vehicle that day?

10   A.    She did, but they were obviously not truthful.    She

11   had stated that she was not -- she didn't have any drugs

12   on her and there were no drugs in the car that she knew

13   of.    I had asked her if she used drugs, and she stated

14   that she -- I believe she stated she didn't remember,

15   said she didn't feel high.

16   Q.    Was there -- did you have any indication -- based on

17   her interaction with you, did she seem like she was

18   significantly under the influence at the time you were

19   talking with her?

20   A.    No, she didn't.

21   Q.    Does she eventually admit to what had happened

22   leading up to law enforcement coming to the vehicle that

23   day?

24   A.    Yes.

25   Q.    And can you describe for the Court what she said

1  about what had been going on?

2  A.    She eventually admitted that she had purchased

3  heroin that day and purchased it from a girl that she

4  knows only as Home Girl, and she also pointed out a photo

5  of the house that she had gone into at 95 Milwaukee

6  Street that officers had observed her go into stating

7  that's where she had gotten it.

8  Q.    Did she state anything about what she was -- about

9  any intention of what she was going to do with the

10  remaining purported heroin?

11  A.    When I asked her if she was planning on selling any

12  to Mr. Walgren, she stated that she had thought about it

13  but she hadn't done it and that they had -- they had

14  talked about it but she said that she only -- she was

15  only thinking about it.

16  Q.    Now, earlier you testified that there was a recorded

17  statement by the defendant about being a dealer or having

18  a larger quantity of heroin.  Do you recall that

19  testimony?

20  A.    Yes.

21  Q.    Was there actually a conversation between the

22  defendant and Mr. Walgren during the August 13 deal where

23  that issue came up?

24  A.    Yes.

25  Q.    Can you describe for the Court what the defendant

1  said?

2  A.    After Miss Nelson had come out of her apartment at

3  1455 Main Street and returned to Mr. Walgren's vehicle

4  and they began driving towards the 3100 block of White

5  Street, during that trip, Ms. Nelson advised Mr. Walgren

6  that her old plug, meaning her old drug dealer, had just

7  been in town and offered her 7 grams for $400, but she

8  stated she had fallen asleep and missed the opportunity

9  to get it and he went back to Chicago.  She stated that

10  he told her she could come to Chicago if she wanted it

11  but she had not done so.

12  Q.    Now, the quantity of heroin, that 7 grams, is that a

13  significant amount of heroin in your -- in your

14  experience?

15  A.    Yes, it is.

16  Q.    How much is -- how much heroin does a typical user

17  use at a given time?

18  A.    A typical user will buy anywhere from maybe 0.1

19  grams up to maybe 0.5 grams to use for themselves, but

20  that would -- that would probably last an entire day.

21  Q.    Is it common for heroin users to buy in bulk and

22  then save it for long periods of time and then use out of

23  a stash all on their own?

24  A.    No.

25  Q.    So based on that experience, what -- would the

quantity of seven grams be consistent with someone who
was buying to redistribute to others?

A.   Correct.

Q.   And did Mr. Walgren and Ms. Nelson actually have a
bit of a conversation about that prospect?

A.   Yes, they did.

Q.   About -- was that Mr. Walgren stating an intention
to potentially buy drugs from her if she were to obtain
that quantity?

A.   Yes.  He asked if he would get a good deal if she
were to have that, and she stated yes but she didn't have
it.

        MR. CHATHAM:  No further questions.

        THE COURT:  Thank you, Mr. Chatham.

    Mr. Meyer?

                    CROSS-EXAMINATION

BY MR. MEYER:

Q.   Officer, so it appears that Emily has primarily
lived in Dubuque, the Dubuque area, for the last several
years; is that correct?

A.   To my knowledge she has, yes.

Q.   To your knowledge, yeah.  And that -- your
information is that she is a low-level dealer?  Is that
consistent with being a heroin addict who needs to buy
some for theirself and in order to do that buys a larger

1  quantity and sells some of it?

2  A.    Correct.

3  Q.    Okay.  And your only -- the only information you had

4  that she would buy a larger amount of that was when she

5  said that she had the possibility of buying seven grams;

6  is that correct?

7  A.    Actually we tried setting up a different deal

8  several months earlier with -- with a different

9  confidential informant where the confidential informant

10  advised she wanted to go, they thought, to Platteville to

11  pick up $1,200 worth of heroin.  Instead it turned out

12  sounded like the heroin was probably in Chicago and that

13  deal fell through.  But either way, the deal we were

14  trying to set up with her was for her to be transported

15  to pick up a larger amount of heroin.

16  Q.    Okay.  But as you say, that fell through.

17  A.    Correct.

18  Q.    And then the other seven-gram possibility didn't

19  occur either?

20  A.    Correct.

21  Q.    During the time that you have known about Emily, has

22  she ever had any problems in Manson, Iowa?

23  A.    Any problems there?

24  Q.    Yes, drug-related problems.  I should be more

25  specific.

1   A.   None that I'm aware of.

2   Q.   Or any problems at all?

3   A.   None that I'm aware of.

4   Q.   Okay.  And the -- the incident where Mr. Walgren

5   overdosed, you indicated that there was a heroin-like

6   substance found near the place where he apparently

7   overdosed; is that correct?

8   A.   Correct.

9   Q.   Was that in a bag?

10  A.   Yes.

11  Q.   Were there other bags found in the residence as well

12  of controlled substances?

13  A.   No.

14  Q.   Just the one bag that was close to the syringe?

15  A.   Correct.  There was a -- there was some foil,

16  tinfoil, found in the living room garbage I believe is

17  where that was located that tested positive for

18  methylenedioxymethamphetamine.

19  Q.   Okay.  Was there any methamphetamine in -- well, let

20  me back up.  Mr. Walgren, was he ever tested?  Was there

21  any drug test done of him on -- in connection with the

22  incident where he overdosed?

23  A.   Nope.  He refused all medical treatment.

24  Q.   So he didn't go to the hospital.

25  A.   He did go to the hospital, but once there, he

1 refused any medical treatment.

2 Q.   And you said he walked there on his own?

3 A.   He walked to the ambulance.

4 Q.   The ambulance.

5 A.   To be -- to be transported.

6 Q.   All right.  And how is he doing now?

7 A.   To my --

8 Q.   Physically.

9 A.   To my knowledge he's fine.

10 Q.   So no long-lasting effects?

11 A.   Not that I'm aware of.

12 Q.   As a matter of fact, it was a pretty short-lasting

13 effect.  You said as soon as he took the NARCAN, then he

14 began to breathe on his own pretty quickly?

15 A.   Shortly after that, yes.

16 Q.   Okay.  Then the other -- last question I want to ask

17 is the incident where there was the overdose that's the

18 basis for the charge was in July of 2020?

19 A.   July 29, 2020.

20 Q.   All right.  The end of July?

21 A.   Correct.

22 Q.   And then for a while there were attempts to set up a

23 deal with Emily?

24 A.   Correct.

25 Q.   At least through September of 2020?

1  A.    August.

2  Q.    August, August of 2020.

3  A.    It was approximately two weeks afterwards that it

4  occurred.

5  Q.    Okay.  And then something happened in August that

6  led her to be arrested?  Did you discuss that?

7  A.    I'm sorry.  Could you repeat that?

8  Q.    According to the pretrial services report that --

9  oh, I take it b -- yeah.  No.  August 19, August 18,

10 Emily was arrested and taken into custody and charged

11 with a controlled substance violation in Dubuque County?

12 A.    I don't know.

13 Q.    You don't know?

14 A.    I don't.

15 Q.    Okay.  And then apparently remained in the community

16 after posting a bond at least until November of 2020; is

17 that correct?

18 A.    I'm not sure what day she got picked up on her

19 warrant.

20 Q.    All right.  Was it like months after this incident

21 that led to the filing of these charges?

22 A.    It would have been at least a couple of months.  I

23 believe it was either some time in mid to late October or

24 early to mid November that she got picked up.  I just

25 don't know the exact date.  So it was -- it was a few

1   months after the incident here in question.

2   Q.    All right.  And when she got picked up, it was on

3   state charges; right?

4   A.    For whatever the warrant was for, yeah.  I'm not

5   aware of the -- the actual charge.

6   Q.    So has she been in custody since November, late

7   October, November in state court until these charges were

8   filed here in federal court?

9   A.    Yes.

10   Q.    So I'm assuming then that it didn't appear that it

11   was thought that Emily was too dangerous to leave on the

12   street for at least several months after this incident

13   that led to the charges.

14   A.    That's not my decision as to when she gets out.

15   Q.    No.  But your decision was not to -- well, let me

16   ask you this.  When did the Dubuque task force come in

17   contact with the federal law enforcement or U.S. attorney

18   in connection with this case?

19   A.    Immediately in contact with them.  Are you talking

20   about when we got the indictment?

21   Q.    Well, no.  You answered the -- the first answer was

22   what I was wondering about is that -- is that there's

23   been federal involvement or at least knowledge since the

24   end of July of 2020 regarding this incident?

25   A.    Correct.

1  Q.   That we're -- the incident that was charged in the

2  indictment; right?

3  A.   Correct.

4  Q.   And it was only in late October, November that she

5  was actually taken into custody and stayed there.

6  A.   Correct.

7        MR. MEYER:  That's all the questions I have.

8  Thank you.

9        THE COURT:  Thank you, Mr. Meyer.

10      Mr. Chatham, any redirect?

11       MR. CHATHAM:  Just briefly, Your Honor.

12                   REDIRECT EXAMINATION

13  BY MR. CHATHAM:

14  Q.   With respect to questions that Mr. Meyer asked you,

15  was the defendant actually taken into custody after the

16  August 13 incident that you've described?

17  A.   Yes.

18  Q.   And then later she was -- and so she was initially

19  taken into custody on a state charge related to that?

20  A.   Correct.

21  Q.   And then did she post bond on that to your

22  knowledge?

23  A.   I'm not sure if she posted bond or if she had a

24  signature bond.  Either way she bonded out.

25  Q.   And so she was under state pretrial supervision

1  during that time to your knowledge?

2  A.    Correct.

3  Q.    I also want to talk about the question that counsel

4  had about how Mr. Walgren's doing now and whether he had

5  any long-lasting effects.  Are you aware, was a medical

6  expert consulted in this case related to Mr. Walgren's

7  condition at the time he was encountered by first

8  responders on his overdose incident?

9  A.    Yes.

10  Q.    And was that specifically a medical expert by the

11  name of Joshua Pruitt with the -- with St. Luke's here in

12  town?

13  A.    Correct.

14  Q.    And is Dr. Pruitt also a medical examiner?

15  A.    Yes.

16  Q.    And did Dr. Pruitt review reports and videos related

17  to Mr. Walgren's overdose event to your knowledge?

18  A.    Yes.

19  Q.    And have you reviewed Dr. Pruitt's report?

20  A.    I have.

21  Q.    Did he give an opinion as to whether Mr. Walgren

22  suffered a serious bodily injury --

23  A.    Yes, he --

24  Q.    -- at that time?

25  A.    Yes, he did.

1  Q.   And what was that opinion?

2  A.   The opinion was that he did suffer a serious bodily

3  injury and, without the assistance of medical

4  professionals, would have likely suffered death.

5  Q.   And was that because of the -- the sort of rapid

6  onset of the severe conditions that Mr. Walgren

7  experienced?

8  A.   Yes.

9  Q.   Or immediately lost consciousness and suffered

10  significant breathing reduction?

11  A.   Correct.

12       MR. CHATHAM:  No further questions.

13       THE COURT:  Thank you, Mr. Chatham.

14  Mr. Meyer, anything else?

15       MR. MEYER:  Just one -- one more question.

16            RECROSS-EXAMINATION

17  BY MR. MEYER:

18  Q.   It's my understanding then that Dr. Pruitt -- is

19  that -- Pruitt is the correct name?

20  A.   Correct.

21  Q.   -- rendered his opinion without the benefit of any

22  knowledge of what substances were actually in

23  Mr. Walgren's blood?

24  A.   Correct.

25  Q.   Okay.

1    MR. MEYER:  That's all, Your Honor.

2    THE COURT:  Thank you, Mr. Meyer.

3    Mr. Chatham?

4                    FURTHER REDIRECT EXAMINATION

5    BY MR. CHATHAM:

6    Q.   With respect to that, did -- was Dr. Pruitt provided

7    with lab reports for the substances that were found in

8    the -- in the apartment?

9    A.   Yes.

10   Q.   And in the report does Dr. Pruitt discuss what types

11   of -- or I guess what could have caused Mr. Walgren to

12   have lost consciousness?

13   A.   Yes.

14   Q.   And what did the report opine as to what could have

15   caused that particular injury that Mr. Walgren suffered?

16   A.   He opined that it was the opioid that caused the

17   serious bodily injury, and he did make mention of the

18   methylenedioxymethamphetamine as well but stated based on

19   the circumstances surrounding the overdose and the

20   positive reaction to the NARCAN which only reverses

21   opioids that the clinical picture was that opioids were

22   the cause of the -- the overdose causing the serious

23   bodily injury.

24   Q.   And just to be clear, the only opioid found in the

25   apartment was the fentanyl that you've described?

1  A.    Correct.

2            MR. CHATHAM:  Nothing further.

3            THE COURT:  Thank you, Mr. Chatham.

4       Mr. Meyer?

5            MR. MEYER:  Nothing further, Your Honor.

6            THE COURT:  Mr. Chatham, any additional

7  evidence or proffer you'd like to make this afternoon?

8            MR. CHATHAM:  No, Your Honor.

9            THE COURT:  Mr. Meyer, do you have any evidence

10  or a proffer you'd like to make?

11           MR. MEYER:  Judge, the only thing, I think

12  you've probably seen this, but I guess I should find out

13  for sure is Mr. Sturdevant sent counsel an e-mail this

14  morning with sort of a supplement to his pretrial

15  services report regarding being contacted by

16  Miss Nelson's father, and I'm just checking to make sure

17  you're aware of that because that's where we propose

18  Miss Nelson be released on conditions.

19           THE COURT:  Let me look to make sure I have the

20  same thing you're talking about.

21           MR. MEYER:  It was just addressed to me and

22  Mr. Chatham, so you might not have seen it, but I don't

23  know.  Mr. Sturdevant could probably let you know if he

24  forwarded that to your office as well.

25           THE COURT:  I have it.  Thank you.

1    MR. MEYER:  Okay.  So we just wanted to make

2  sure that -- that's why I asked the questions about

3  Manson, Iowa.  That's where Mr. -- Emily's father

4  resides, and that's where we propose to have her released

5  to.

6    THE COURT:  Very good.  Then let's proceed to

7  argument if either party would like to make one.  We can

8  begin with you, Mr. Chatham.

9    MR. CHATHAM:  Thank you, Your Honor.  I'll

10  start from the point here that under 3142(e) this is a

11  rebuttable presumption case, so if there's probable cause

12  to believe the defendant committed the offense in

13  particular, the offenses of possession with intent to

14  distribute controlled substance and distribution of

15  controlled substance resulting in serious bodily injury

16  as alleged in the indictment, that there's a rebuttable

17  presumption that no condition or combination of

18  conditions will reasonably assure her appearance and the

19  safety of the community.

20    Here the grand jury has returned an indictment on

21  both of those counts, and additionally we believe the

22  evidence presented today also provides more than probable

23  cause for each of those offenses.  And so we believe this

24  is a rebuttable presumption case.

25    Looking at the 3142(g) factors here, this is a case

 1   involving a controlled substance, not just any controlled
 2   substance.  It involves fentanyl and not just simply
 3   involving fentanyl.  It involves an incident where the
 4   defendant distributed fentanyl and another individual
 5   almost died.  And so it is a very serious case.
 6       I understand Mr. Meyer's comments and anticipated
 7   argument about this is an individual who uses drugs, and,
 8   you know, to support her own habit she deals.  Frankly, I
 9   don't think that cuts very well in a defendant's favor
10   who's expecting to or attempting to be released on to
11   pretrial release because that's how the defendant
12   supported her habit.  She puts other people in danger
13   when she uses drugs in this fashion.  She's not only
14   getting drugs for herself, she's getting drugs for other
15   people, and there are consequences for those other people
16   as a result of the defendant's conduct.
17       And so the fact of her being a user in this case
18   actually causes a danger to the community because her
19   modus operandi for getting drugs is to get drugs for
20   herself and other people, thereby putting other people in
21   danger.
22       We believe the weight of the evidence here is very
23   strong on all of the counts.  This defendant is -- first
24   of all, we have Mr. Walgren who's stated -- given the
25   outline of the events of the 29th, and those -- that

outline that he gave was corroborated by messages from

Mr. Walgren's phone involving the defendant corroborated

by traffic camera footage, independent traffic camera

footage, that shows the defendant getting into

Mr. Walgren's vehicle, driving to the location where

Mr. Walgren described they drove to get the drugs.

And then it's further corroborated by the drug

evidence that was found at the scene which is consistent,

fentanyl being an opioid, consistent with the transaction

that Mr. Walgren described, also consistent when we fast

forward to the August 13 incident that is set up in much

the same way that the July 29 incident occurred.  The

drugs that came back in that also were fentanyl in the

same way that the drugs from the 29th, so that's

additional corroboration there.

The fact that law enforcement was able to

reconstruct the -- what was seen on the body camera -- or

excuse me, on the traffic camera from July 29, were able

to reconstruct that not once but twice, at least

partially twice on the 30th when they had the attempted

controlled buy where the defendant ran off with the

money, everything up to that point appeared very similar

to what had happened just the day before and then

likewise on August 13 very similar fact pattern where

Mr. Walgren reaches out through the same medium to the

same person and then ends up with the exact same drugs in
effectively the same location.

So we believe the evidence here is very strong that
the defendant committed all of the charge -- or all of
the crimes alleged in the indictment.

When we look at the history and characteristics of
this defendant, they are not favorable for release.  This
defendant does have a lifelong -- apparently lifelong
connection to the state of Iowa.  She's lived in a few
different towns in Iowa.  She does have family in Iowa,
her stepfather in Manson who I understand the defendant
considers to be her father because that's basically been
the father she's known her entire life.

That -- and I -- from review of that e-mail, I
understand Mr. Nelson's statement that he will basically
do the best he can which is all anyone can be asked to
do, but the problem with that is that there are no
guarantees with this particular defendant that she would
abide by anything that her stepfather told her to do or
anything that this Court would tell her to do.

And that's amply shown by the remainder of the
pretrial services report.  This is a defendant who has
not held steady jobs despite the fact that she is 28
years old.  She's -- her employment has been sporadic at
best.  There's no real indication here as to what she's

done for money for her adult life other than the
testimony that indicates that she's been involved in
selling and middling drugs.

Additionally, the defendant has only had sporadic
times where she has stayed with different people.  It's
not a situation where she's been in one location for
several years and not sort of moved on to the next thing,
so I don't -- I don't believe as well intentioned as
Mr. Nelson may be that he would have the power to keep
this defendant on the straight and narrow while she's on
pretrial release.

That is further demonstrated by the defendant's
prior record.  Now, this defendant's prior record is
somewhat indicative of an individual who has a severe
drug problem, and I think that's fairly clear based on
the testimony today and the other information in the
pretrial services report.

I think it's somewhat telling or somewhat concerning
here that the defendant -- and I understand it's at
request of defense counsel but a defendant who refuses to
answer questions about her substance abuse history while
simultaneously proposing that she be released to pretrial
supervision while not giving the Court enough information
to determine what would be appropriate conditions of
release, I think that's a problem, particularly in a case

1  like this where there are other extreme red flags about

2  significant drug use.

3      So in addition to just the number of charges that

4  involve theft and possession of drugs and drug

5  paraphernalia, providing false information certainly from

6  2018 at paragraph 5 on page 5 of the pretrial services

7  report, the fact that she's falsely identifying herself

8  to the police, an additional theft charge, aggravated

9  misdemeanor theft charge from Dubuque County from 2018, a

10 theft in the fifth degree charge from 2018, another th --

11 a theft in the third degree charge from 2020.  Some of

12 those charges resulted in convictions.  Others did not.

13     But a fairly common theme throughout the defendant's

14 criminal history is her history of failing to appear.

15 She failed to appear first in September of 2016 and had a

16 bond forfeiture in Dubuque County on a driving while

17 license denied, suspended, cancelled, or revoked.  There

18 was a second failure to appear that's reflected at both

19 paragraphs 3 and 4.  It appears that those were sort of

20 at the same time, failed to appear for a hearing in April

21 of 2017, failed to appear for another hearing as

22 reflected in paragraph 5 in July of 2018, failed to

23 appear for a pretrial conference, additionally, in August

24 of that same year, another failure to appear for failing

25 to appear for a pretrial conference in August of 2018.

1 That appears also related to the conviction or -- yes,

2 the conviction and prosecution in paragraph 7.

3     And then perhaps most tellingly, Mr. Meyer asked

4 questions of the witness about this defendant's danger

5 and appearing to implicate the idea that because she

6 wasn't taken into immediate custody after August 13 and

7 remaining in custody that she's somehow not perceived to

8 be a danger.

9     I think it's also telling when it comes to the

10 defendant's -- the reasonable -- whether we could

11 reasonably assure that she would appear is that after

12 this, she was given an opportunity such that that's what

13 this was that she gets arrested, knows that she's got

14 these charges potentially coming, she's talked with the

15 task force about an arrest, and she fails to appear for a

16 pretrial conference in November of 2020 and has a warrant

17 issued for her that eventually gets executed on November

18 11.

19     So -- so her fifth -- what appears to be fifth

20 failure to appear occurred three months ago.  So based on

21 this information, this defendant is a very high risk not

22 only to be a danger to the community as discussed before

23 but also to not appear for all court proceedings as

24 required.

25     This is a very serious offense this defendant is

```
 1   facing.  She faces a 20-year mandatory minimum on the
 2   first count based on the injury that was -- that occurred
 3   to Mr. Walgren.  So the incentive for this defendant to
 4   not appear should she choose to go that route would be
 5   very high.
 6        So we believe based on all the facts and
 7   circumstances presented here today that there is no
 8   condition or combination of conditions that would
 9   reasonably assure this defendant's appearance in court as
10   required or the safety of the community, and we would ask
11   that she be detained.
12            THE COURT:  Thank you, Mr. Chatham.
13        Mr. Meyer?
14            MR. MEYER:  I would say, Your Honor, that any
15   time -- well, my -- my dealings with people who are
16   heroin addicts, their life is really messy.  I mean, it's
17   not easy to function in society when you're addicted to
18   particularly heroin, other substances as well.  So it's
19   not surprising that Emily has some convictions for using
20   heroin and other substances and stealing, taking things
21   presumably to get money to buy more drugs or even going
22   in to buy some drugs to sell maybe to another person so
23   she'd have enough for herself.  If nothing else, one user
24   is going to feel compassion and sympathy for another
25   user.  I mean, that's -- it's not that they're evil
```

people.  It's just that -- the circumstances that they

find themselves in.

So our proposal is to take her completely out of the

environment that has made her life so messy and put her

in the custody of her stepfather who took this very

seriously, said after consulting with his wife who is

concerned about, you know, Emily's associates putting the

other children in harm's way, they were willing, knowing

her, to take her back in but on very strict rules

including no cell phone in Manson, Iowa, far from Dubuque

County where she's run into some problems.

Now, given that she's never had any issues -- I

don't know, frankly, how long she's lived in Manson but

never had any issues in Manson and her stepfather is

willing to take her in under those conditions, I would

ask the Court to seriously consider releasing her to the

stepfather on whatever rules and conditions the Court

felt is necessary.  That's all, Your Honor.

THE COURT:  Thank you, Mr. Meyer.

Ms. Nelson, I'll probably direct most of my remarks

to you at our hearing this afternoon as I make my

decision.  The lawyers are very familiar with these

proceedings, but I can understand why it might be strange

for someone in your position at a hearing like this.  One

thing I hope is obvious, that this isn't your trial

because there's no jury there in the courtroom.  I think
it's probably less obvious but still important that when
you do go to your jury trial the jury's never going to
hear anything that I have to say about the strength of
the evidence or what I have to say about whether you
present a danger to the community or whether you pose a
risk of not showing up for hearings in the future, things
like that.  You're innocent until proven guilty.  And
like I say, the jury's never going to hear what I think
or say about the evidence in this case.

My job is to determine if you should be released
pending that trial.  And normally, as I mentioned at the
beginning of the hearing, the government has the burden
of proving that you're a risk of nonappearance by what's
called a preponderance of the evidence.  That's like the
scales of justice you sometimes see in a sculpture on a
courthouse wall.  And if the scales tip just slightly in
favor of the government, then it's met that burden.  They
have to prove you're a danger by clear and convincing
evidence.

Your case is a little different because there's a
rebuttable presumption because of what you're charged
with, as Mr. Chatham indicated, that you should be
detained in this case.

I think rebuttable presumption is a tough concept to

1  explain to nonlawyers, but what I usually say to people

2  is it means that the government has kind of a head start

3  because of the nature of what you're charged with in

4  proving that you should be detained.

5       What I tend to do is look at the factors that

6  Mr. Meyer and Mr. Chatham have been talking about today

7  to determine whether you should be detained regardless of

8  that presumption or not.

9       The first is the nature and circumstances of the

10  offense charged including whether the crime involved

11  violence or a firearm.  I'm glad to say it didn't involve

12  violence or a firearm, and you're not a violent person

13  based on what I can see in the record, although there is

14  obviously something dangerous about dealing and using

15  fentanyl.  That's -- that's obvious.  What happened to

16  Mr. Walgren is the danger that dealing or sharing drugs

17  poses.

18       In terms of the weight of the evidence, I agree with

19  Mr. Chatham.  The weight of the evidence is strongly

20  against you in terms of what's been charged in the

21  indictment based on the video evidence and your

22  interaction with Mr. Walgren, so that's a factor that

23  weighs against you in this case.

24       Turning to your history and characteristics,

25  obviously you have prolonged ties to the Dubuque

1    community and to Iowa in general.  But you haven't had

2    employment that's significant as an adult.  It seems from

3    what we can tell you've relied on others or you've been

4    dealing -- dealing drugs.

5        You didn't give information to the probation office

6    about your drug history, and I don't hold it against

7    people who don't want to talk to the government.  That's

8    your Fifth Amendment right.  It does kind of leave us

9    somewhat speculating about your drug history, but it's

10   not too speculative really.  Seems to be fairly obvious

11   that you do have a serious addiction problem.  And I try

12   to be clear to people that this Court isn't in the

13   business of locking people up because they have addiction

14   problems.

15       But the danger that that addiction presents to the

16   community and the risk of you not appearing is certainly

17   my concern and the Court's concern, and I think the lack

18   of treatment, the absence of a treatment option, it's

19   certainly laudable that your stepfather has made his home

20   available to you even under these circumstances, but

21   that's not exactly a secure or an inpatient facility

22   which apparently is -- at least in my view is something

23   you would need to deal with the serious addiction problem

24   you have.

25       Turning to your risk of nonappearance more

specifically, you have failed to appear on charges in the

past.  I do believe you do pose a risk of danger to the

community because of your drug habit, your interacting

with felons on a regular basis in order to obtain heroin,

and then sharing it or dealing it to others as we see in

this case does pose a danger to the community.

So based on the totality of the evidence before me,

I find the government -- first of all, I find that you

have not rebutted the presumption in this case.  But even

if I'm wrong about that, based on the totality of the

evidence before me, I find the government has carried its

burden of showing by a preponderance of the evidence that

the defendant poses a risk of nonappearance and by clear

and convincing evidence the defendant poses a danger to

the community.

I conclude there is no condition or combination of

conditions I could impose with which the defendant would

comply and appear as required at trial and hearings in

this matter and that would ensure the safety of the

community.

I, therefore, order the defendant be committed to

the custody of the attorney general until trial in this

matter.

Ms. Nelson, you don't have to agree with my decision

or what I -- my view of the facts in this case.  In fact,

1  you have a right to appeal my decision to the district

2  court judge that's assigned to your case, and you have 14

3  days from today to file such an appeal.  Do you

4  understand your right to appeal my decision, Ms. Nelson?

5  　　　　　THE DEFENDANT:  Yes, Your Majesty.

6  　　　　　THE COURT:  Is there anything further on behalf

7  of the United States?

8  　　　　　MR. CHATHAM:  No, Your Honor.

9  　　　　　THE COURT:  Anything further on behalf of

10  defendant, Mr. Meyer?

11  　　　　　MR. MEYER:  No, Your Honor.  Thank you all.

12  That will conclude our hearing.

13  　　　　　(The foregoing hearing was

14  　　　　　concluded at 3:10 p.m.)

15  　　　　　　　　　　　*  *  *  *

16  　(This concludes the transcript of the audio recording.)

17

18

19

20  　　　　　　　　　　CERTIFICATE

21  　　　　I certify that the foregoing is a correct

22  transcript to the best of my ability from the digital

23  recording of proceedings in the above-entitled matter.

24  　　　S/Shelly Semmler　　　　　　　3-8-22
　　　　　Shelly Semmler, RDR, CRR　　　　Date

25

**<u>INDEX</u>**

**<u>WITNESS</u>:**                                                    **<u>PAGE</u>:**

CHAD LEITZEN
            DIRECT EXAMINATION                          3
            BY MR. CHATHAM
            CROSS-EXAMINATION                          28
            BY MR. MEYER
            REDIRECT EXAMINATION                       34
            BY MR. CHATHAM
            RECROSS-EXAMINATION                        36
            BY MR. MEYER
            FURTHER REDIRECT EXAMINATION               37
            BY MR. CHATHAM

                        * * * * *

## $

**$1,200** [1] - 29:11
**$120** [4] - 11:8, 11:13, 14:6, 15:3
**$20** [1] - 21:21
**$400** [1] - 27:7

## 0

**0.1** [1] - 27:18
**0.5** [1] - 27:19

## 1

**11** [2] - 1:11, 45:18
**111** [2] - 1:10, 1:14
**12** [2] - 2:22, 10:18
**13** [8] - 17:25, 18:6, 18:24, 26:22, 34:16, 41:11, 41:24, 45:6
**14** [1] - 52:2
**1455** [2] - 19:21, 27:3
**15th** [1] - 19:25
**18** [1] - 32:9
**19** [1] - 32:9
**1:58** [1] - 1:11

## 2

**2** [1] - 13:24
**20-year** [1] - 46:1
**2016** [2] - 4:6, 44:15
**2017** [2] - 12:12, 44:21
**2018** [5] - 44:6, 44:9, 44:10, 44:22, 44:25
**2020** [10] - 5:8, 5:25, 31:18, 31:19, 31:25, 32:2, 32:16, 33:24, 44:11, 45:16
**2021** [1] - 1:11
**21-CR-1009** [1] - 2:5
**233-3846** [1] - 1:21
**2500** [1] - 22:5
**28** [2] - 42:23, 53:4
**29** [8] - 5:25, 6:6, 9:19, 10:19, 11:22, 31:19, 41:12, 41:18
**29th** [2] - 40:25, 41:14
**2:00** [1] - 8:16
**2:01** [1] - 9:18
**2:08** [1] - 9:23
**2:09** [1] - 9:23
**2:21** [1] - 10:3
**2:54** [2] - 6:5

## 3

**3** [2] - 44:19, 53:3
**3-8-22** [1] - 52:24
**30** [2] - 11:1, 17:17

**30th** [1] - 41:20
**31** [2] - 11:15, 17:24
**3100** [4] - 9:20, 13:24, 14:4, 27:4
**3142(e** [1] - 39:10
**3142(g** [1] - 39:25
**31st** [1] - 13:17
**320** [1] - 1:20
**32nd** [4] - 9:24, 9:25, 10:2, 10:3
**34** [1] - 53:5
**36** [1] - 53:6
**37** [1] - 53:7
**3:10** [1] - 52:14

## 4

**4** [1] - 44:19
**425** [2] - 1:17, 1:17

## 5

**5** [3] - 44:6, 44:22
**51101** [2] - 1:21
**52401** [2] - 1:15, 1:18

## 6

**600** [1] - 13:22

## 7

**7** [3] - 27:7, 27:12, 45:2
**712** [1] - 1:21

## 9

**95** [2] - 21:10, 26:5

## A

**a.m** [4] - 6:5, 8:17, 9:19, 10:3
**abide** [1] - 42:19
**ability** [1] - 52:22
**able** [13] - 7:7, 9:8, 9:11, 9:15, 9:17, 11:14, 14:21, 14:25, 17:7, 19:15, 19:23, 41:16, 41:18
**aborted** [1] - 10:25
**above-entitled** [1] - 52:23
**absence** [1] - 50:18
**abuse** [1] - 43:21
**accept** [1] - 16:11
**according** [3] - 5:4, 8:16, 32:8
**acetaminophen** [2] - 24:6, 24:15
**acknowledge** [1] - 20:16
**actual** [1] - 33:5

**addict** [1] - 28:24
**addicted** [1] - 46:17
**addiction** [4] - 50:11, 50:13, 50:15, 50:23
**addicts** [1] - 46:16
**addition** [1] - 44:3
**additional** [6] - 10:12, 10:14, 17:19, 38:6, 41:15, 44:8
**additionally** [3] - 39:21, 43:4, 44:23
**addressed** [1] - 38:21
**administered** [3] - 6:14, 6:24, 18:13
**administration** [1] - 7:3
**admit** [1] - 25:21
**admitted** [1] - 26:2
**adult** [2] - 43:1, 50:2
**advised** [8] - 7:16, 9:2, 14:19, 15:19, 19:20, 22:10, 27:5, 29:10
**advising** [2] - 5:25, 8:14
**afternoon** [4] - 2:12, 10:19, 38:7, 47:21
**afterwards** [1] - 32:3
**agent** [1] - 3:24
**aggravated** [1] - 44:8
**ago** [1] - 45:20
**agree** [4] - 7:9, 20:25, 49:18, 51:24
**agreed** [4] - 12:14, 17:25, 20:14, 21:21
**ahead** [1] - 12:16
**ahold** [1] - 7:23
**alleged** [2] - 39:16, 42:5
**alley** [2] - 22:4, 22:6
**almost** [2] - 17:24, 40:5
**alone** [1] - 11:16
**altogether** [1] - 14:25
**ambient** [1] - 10:8
**ambulance** [3] - 7:7, 31:3, 31:4
**Amendment** [1] - 50:8
**AMERICA** [1] - 1:3
**America** [1] - 3:25
**amount** [5] - 12:17, 23:5, 27:13, 29:4, 29:15
**amply** [1] - 42:21
**analysis** [1] - 16:15
**Ann** [2] - 2:5, 3:25
**ANN** [1] - 1:6
**answer** [3] - 10:24, 33:21, 43:21
**answered** [1] - 33:21
**antagonist** [1] - 6:17
**anticipated** [1] - 40:6
**apartment** [7] - 12:20, 15:8, 15:11, 20:1, 20:3, 27:2, 37:8, 37:25

**appeal** [3] - 52:1, 52:3, 52:4
**appear** [17] - 16:2, 33:10, 44:14, 44:15, 44:18, 44:20, 44:21, 44:23, 44:24, 44:25, 45:11, 45:15, 45:20, 45:23, 46:4, 51:1, 51:18
**appearance** [2] - 39:18, 46:9
**APPEARANCES** [1] - 1:12
**appeared** [3] - 23:14, 24:17, 41:22
**appearing** [3] - 2:11, 45:5, 50:16
**appropriate** [1] - 43:24
**April** [2] - 12:12, 44:20
**area** [6] - 9:18, 9:20, 13:22, 13:23, 21:24, 28:19
**argument** [2] - 39:7, 40:7
**arrest** [2] - 22:12, 45:15
**arrested** [3] - 32:6, 32:10, 45:13
**arrived** [3] - 6:11, 20:19, 20:20
**asleep** [1] - 27:8
**assigned** [2] - 3:22, 52:2
**assistance** [2] - 7:5, 36:3
**Assistant** [1] - 1:14
**assisting** [1] - 6:12
**associates** [1] - 47:7
**assuming** [1] - 33:10
**assure** [3] - 39:18, 45:11, 46:9
**attempt** [3] - 10:25, 18:7, 18:21
**attempted** [4] - 11:2, 18:23, 18:24, 41:20
**attempting** [2] - 8:19, 40:10
**attempts** [3] - 17:19, 17:23, 31:22
**attention** [2] - 5:9, 5:23
**Attorney** [1] - 1:14
**attorney** [2] - 33:17, 51:22
**audio** [3] - 2:1, 19:9, 52:16
**August** [16] - 17:24, 18:6, 18:24, 26:22, 32:1, 32:2, 32:5, 32:9, 34:16, 41:11, 41:24, 44:23, 44:25, 45:6
**auto** [1] - 20:13
**available** [1] - 50:20
**Avenue** [3] - 1:10, 1:14, 13:23
**aware** [6] - 30:1, 30:3, 31:11, 33:5, 35:5, 38:17

## B

**bag** [9] - 6:13, 12:23, 12:25, 15:18, 21:13, 21:15, 23:5, 30:9, 30:14
**baggie** [3] - 16:5, 16:20,

23:25
**bags** [2] - 12:18, 30:11
**ball** [1] - 23:8
**bar** [1] - 19:7
**based** [15] - 4:24, 13:7, 13:15, 20:25, 25:16, 27:25, 37:18, 43:15, 45:20, 46:2, 46:6, 49:13, 49:21, 51:7, 51:10
**basis** [2] - 31:18, 51:4
**bathroom** [1] - 14:2
**became** [1] - 7:5
**becoming** [1] - 7:10
**bed** [1] - 15:16
**began** [5] - 6:12, 7:4, 21:25, 27:4, 31:14
**begin** [1] - 39:8
**beginning** [1] - 48:13
**behalf** [2] - 52:6, 52:9
**behind** [2] - 9:21, 20:13
**benefit** [2] - 3:13, 36:21
**best** [3] - 42:16, 42:25, 52:22
**better** [1] - 12:7
**between** [8] - 14:11, 14:14, 14:16, 20:15, 23:9, 23:12, 23:13, 26:21
**bit** [2] - 21:5, 28:5
**block** [7] - 9:20, 13:22, 13:24, 14:4, 20:1, 22:5, 27:4
**blocks** [2] - 14:3, 22:3
**blood** [1] - 36:23
**blue** [1] - 6:22
**bodily** [5] - 35:22, 36:2, 37:17, 37:23, 39:15
**body** [4] - 11:12, 18:15, 22:7, 41:17
**bond** [5] - 32:16, 34:21, 34:23, 34:24, 44:16
**bonded** [1] - 34:24
**boyfriend** [1] - 6:1
**bra** [1] - 21:24
**breathe** [1] - 31:14
**breathing** [4] - 6:14, 6:23, 7:4, 36:10
**breaths** [1] - 6:22
**briefly** [1] - 34:11
**Brittani** [2] - 5:24, 11:19
**building** [3] - 9:21, 12:21, 12:25
**bulk** [1] - 27:21
**burden** [4] - 2:17, 48:13, 48:18, 51:12
**business** [1] - 50:13
**buy** [16] - 12:8, 17:19, 18:8, 18:11, 18:23, 18:24, 21:4, 21:5, 27:18, 27:21, 28:8, 28:24, 29:4, 41:21, 46:21, 46:22
**buying** [2] - 28:2, 29:5

**buys** [2] - 18:14, 28:25
**BY** [10] - 3:16, 28:17, 34:13, 36:17, 37:5, 53:4, 53:5, 53:6, 53:7, 53:8

# C

**camera** [8] - 9:5, 9:22, 10:7, 10:9, 41:3, 41:17, 41:18
**cancelled** [1] - 44:17
**car** [3] - 9:18, 24:1, 25:12
**careful** [1] - 13:9
**carried** [1] - 51:11
**case** [19] - 3:24, 18:23, 33:18, 35:6, 39:11, 39:24, 39:25, 40:5, 40:17, 43:25, 48:10, 48:21, 48:24, 49:23, 51:6, 51:9, 51:25, 52:2
**caused** [4] - 7:18, 37:11, 37:15, 37:16
**causes** [1] - 40:18
**causing** [1] - 37:22
**Cedar** [5] - 1:10, 1:15, 1:18
**cell** [1] - 47:10
**certainly** [3] - 44:5, 50:16, 50:19
**CERTIFICATE** [1] - 52:20
**certify** [1] - 52:21
**Chad** [2] - 3:3, 3:19
**CHAD** [2] - 3:8, 53:3
**chain** [1] - 13:5
**change** [1] - 6:25
**characteristics** [2] - 42:6, 49:24
**charge** [8] - 31:18, 33:5, 34:19, 42:4, 44:8, 44:9, 44:10, 44:11
**charged** [6] - 32:10, 34:1, 48:22, 49:3, 49:10, 49:20
**charges** [8] - 32:21, 33:3, 33:7, 33:13, 44:3, 44:12, 45:14, 51:1
**CHATHAM** [19] - 1:13, 2:8, 2:15, 2:19, 3:3, 3:14, 3:16, 28:13, 34:11, 34:13, 36:12, 37:5, 38:2, 38:8, 39:9, 52:8, 53:4, 53:6, 53:8
**Chatham** [14] - 2:18, 3:12, 28:14, 34:10, 36:13, 37:3, 38:3, 38:6, 38:22, 39:8, 46:12, 48:23, 49:6, 49:19
**checking** [1] - 38:16
**Chicago** [3] - 27:9, 27:10, 29:12
**children** [1] - 47:8
**choose** [1] - 46:4
**chunky** [2] - 23:5, 23:6
**CI** [1] - 13:9
**circumstances** [6] - 7:10, 37:19, 46:7, 47:1, 49:9,

50:20
**City** [1] - 1:21
**city** [2] - 3:21, 9:4
**clean** [1] - 21:23
**cleans** [1] - 21:22
**clear** [5] - 37:24, 43:15, 48:19, 50:12, 51:13
**clearly** [1] - 8:11
**clinical** [1] - 37:21
**close** [1] - 30:14
**combination** [3] - 39:17, 46:8, 51:16
**coming** [2] - 25:22, 45:14
**commencing** [1] - 1:11
**comments** [2] - 5:5, 40:6
**committed** [2] - 39:12, 42:4, 51:21
**common** [2] - 27:21, 44:13
**commonly** [1] - 15:24
**communications** [4] - 13:20, 14:13, 14:16, 14:18
**community** [12] - 32:15, 39:19, 40:18, 45:22, 46:10, 48:6, 50:1, 50:16, 51:3, 51:6, 51:15, 51:20
**compassion** [1] - 46:24
**complete** [1] - 9:1
**completely** [1] - 47:3
**comply** [1] - 51:18
**concept** [1] - 48:25
**concern** [2] - 50:17
**concerned** [1] - 47:7
**concerning** [1] - 43:18
**conclude** [2] - 51:16, 52:12
**concluded** [1] - 52:14
**concludes** [1] - 52:16
**condition** [6] - 6:19, 6:25, 35:7, 39:17, 46:8, 51:16
**conditions** [5] - 36:6, 38:18, 39:18, 43:24, 46:8, 47:15, 47:17, 51:17
**conduct** [1] - 40:16
**conducted** [1] - 13:3
**conference** [3] - 44:23, 44:25, 45:16
**confidential** [4] - 4:13, 12:4, 29:9
**confirm** [1] - 10:13
**confirmed** [1] - 21:17
**confirming** [1] - 13:5
**connection** [3] - 30:21, 33:18, 42:9
**conscious** [1] - 7:5
**consciousness** [2] - 36:9, 37:12
**consent** [1] - 8:2
**consequences** [1] - 40:15
**consider** [2] - 2:20, 47:16
**considers** [1] - 42:12

**consistent** [8] - 15:14, 24:5, 24:14, 28:1, 28:24, 41:8, 41:9, 41:10
**consulted** [1] - 35:6
**consulting** [1] - 47:6
**contact** [6] - 10:21, 13:16, 13:18, 18:2, 33:17, 33:19
**contacted** [4] - 7:25, 12:13, 12:16, 38:15
**contained** [1] - 2:21
**container** [1] - 16:6
**containing** [1] - 16:6
**context** [1] - 4:7
**contraband** [1] - 11:10
**controlled** [14] - 18:8, 18:11, 18:13, 18:23, 18:24, 24:25, 25:1, 30:12, 32:11, 39:14, 39:15, 40:1, 41:21
**conversation** [4] - 20:15, 21:1, 26:21, 28:5
**conversations** [1] - 4:24
**conviction** [2] - 45:1, 45:2
**convictions** [2] - 44:12, 46:19
**convincing** [2] - 48:19, 51:14
**correct** [34] - 5:18, 5:21, 6:7, 9:10, 10:11, 13:14, 17:16, 19:2, 25:1, 25:2, 28:3, 28:20, 29:2, 29:6, 29:17, 29:20, 30:7, 30:8, 30:15, 31:21, 31:24, 32:17, 33:25, 34:3, 34:6, 34:20, 35:2, 35:13, 36:11, 36:19, 36:20, 36:24, 38:1, 52:21
**corroborate** [2] - 8:6, 8:22
**corroborated** [5] - 9:5, 9:7, 41:1, 41:2, 41:7
**corroboration** [1] - 41:15
**cotton** [1] - 23:7
**counsel** [3] - 35:3, 38:13, 43:20
**count** [1] - 46:2
**counts** [2] - 39:21, 40:23
**County** [4] - 32:11, 44:9, 44:16, 47:11
**couple** [2] - 14:3, 32:22
**course** [1] - 15:1
**COURT** [24] - 1:1, 2:4, 2:10, 2:14, 2:16, 2:23, 2:25, 3:5, 3:9, 3:11, 28:14, 34:9, 36:13, 37:2, 38:3, 38:6, 38:9, 38:19, 38:25, 39:6, 46:12, 47:19, 52:6, 52:9
**court** [5] - 33:7, 33:8, 45:23, 46:9, 52:2
**Court** [16] - 1:10, 2:4, 2:20, 5:22, 9:15, 10:16, 12:10, 18:10, 23:2, 25:25, 26:25, 42:20, 43:23, 47:16, 47:17,

50:12
**Court's** [1] - 50:17
**Courthouse** [1] - 1:10
**courthouse** [1] - 48:17
**courtroom** [1] - 48:1
**CR21-1009-CJW** [1] - 1:5
**crime** [1] - 49:10
**crimes** [1] - 42:5
**criminal** [1] - 44:14
**CROSS** [2] - 28:16, 53:4
**CROSS-EXAMINATION** [2] - 28:16, 53:4
**CRR** [2] - 1:20, 52:24
**currency** [1] - 18:17
**cushion** [1] - 23:13
**cushions** [1] - 23:12
**custody** [11] - 22:19, 25:3, 32:10, 33:6, 34:5, 34:15, 34:19, 45:6, 45:7, 47:5, 51:22
**cutoff** [2] - 17:10, 17:13
**cuts** [1] - 40:9
**cyanotic** [1] - 6:21

# D

**daily** [1] - 17:24
**DAN** [1] - 1:13
**danger** [13] - 40:12, 40:18, 40:21, 45:4, 45:8, 45:22, 48:6, 48:19, 49:16, 50:15, 51:2, 51:6, 51:14
**dangerous** [2] - 33:11, 49:14
**Date** [1] - 52:24
**date** [1] - 32:25
**days** [3] - 11:24, 13:3, 52:3
**DCI** [7] - 16:6, 16:10, 16:15, 17:5, 17:10, 24:1, 24:8
**deal** [13] - 8:8, 10:22, 11:13, 11:16, 13:13, 18:3, 26:22, 28:10, 29:7, 29:13, 31:23, 50:23
**dealer** [10] - 5:4, 12:16, 12:17, 12:21, 12:24, 14:7, 21:3, 26:17, 27:6, 28:23
**dealer's** [2] - 13:4, 13:5
**dealers** [1] - 12:14
**dealing** [6] - 13:9, 49:14, 49:16, 50:4, 51:5
**dealings** [1] - 46:15
**deals** [2] - 5:1, 40:8
**dealt** [1] - 4:9
**death** [1] - 36:4
**decided** [1] - 15:2
**decision** [6] - 33:14, 33:15, 47:22, 51:24, 52:1, 52:4
**Defendant** [2] - 1:7, 1:16
**DEFENDANT** [1] - 52:5
**defendant** [51] - 2:11, 4:2,

4:4, 4:8, 4:15, 7:24, 8:7, 8:20, 8:24, 9:11, 9:16, 10:10, 13:16, 14:13, 14:15, 15:4, 17:17, 17:20, 18:4, 20:16, 20:25, 25:3, 26:17, 26:22, 26:25, 34:15, 39:12, 40:4, 40:11, 40:23, 41:2, 41:4, 41:21, 42:4, 42:7, 42:8, 42:11, 42:18, 42:22, 43:4, 43:10, 43:19, 43:20, 45:21, 45:25, 46:3, 51:13, 51:14, 51:17, 51:21, 52:10
**defendant's** [8] - 40:9, 40:16, 43:12, 43:13, 44:13, 45:4, 45:10, 46:9
**defense** [1] - 43:20
**degree** [2] - 44:10, 44:11
**demonstrated** [1] - 43:12
**denied** [1] - 44:17
**department** [1] - 6:2
**describe** [10] - 4:22, 7:2, 7:19, 9:15, 10:16, 12:10, 18:10, 23:2, 25:25, 26:25
**described** [7] - 9:9, 17:2, 18:21, 34:16, 37:25, 41:6, 41:10
**description** [1] - 7:21
**designation** [1] - 17:4
**despite** [1] - 42:23
**detail** [1] - 3:1
**detained** [4] - 46:11, 48:24, 49:4, 49:7
**DETENTION** [1] - 1:6
**detention** [2] - 2:6, 2:16
**Detention** [1] - 1:9
**determine** [4] - 9:16, 43:24, 48:11, 49:7
**device** [2] - 11:12, 18:15
**died** [1] - 40:5
**different** [5] - 29:7, 29:8, 42:10, 43:5, 48:21
**digital** [2] - 1:20, 52:22
**direct** [1] - 47:20
**DIRECT** [2] - 3:15, 53:3
**directed** [2] - 13:23, 20:9
**directly** [5] - 9:19, 14:4, 19:25, 21:10, 21:13
**director** [1] - 22:10
**disappeared** [1] - 14:7
**discuss** [2] - 32:6, 37:10
**discussed** [1] - 45:22
**dispatch** [1] - 5:24
**distribute** [1] - 39:14
**distributed** [1] - 40:4
**distribution** [1] - 39:14
**district** [1] - 52:1
**DISTRICT** [2] - 1:1, 1:1
**District** [1] - 1:10
**DIVISION** [1] - 1:2
**document** [1] - 2:22

**dollars** [1] - 18:16
**done** [7] - 15:8, 16:11, 24:16, 26:13, 27:11, 30:21, 43:1
**door** [2] - 21:10, 23:10
**down** [1] - 23:14
**Dr** [6] - 35:14, 35:16, 35:19, 36:18, 37:6, 37:10
**drawn** [2] - 15:25, 16:12
**drive** [3] - 13:23, 19:21, 22:2
**driven** [1] - 9:19
**driving** [4] - 22:3, 27:4, 41:5, 44:16
**dropped** [2] - 9:3, 12:25
**drove** [4] - 14:4, 19:5, 19:24, 41:6
**Drug** [4] - 3:23, 5:9, 11:5, 12:2
**drug** [31] - 4:11, 4:15, 5:1, 5:4, 8:8, 11:7, 11:13, 12:14, 12:16, 12:17, 12:21, 12:22, 12:24, 13:4, 13:5, 14:7, 15:10, 15:11, 18:17, 22:10, 22:25, 27:6, 29:24, 30:21, 41:7, 43:15, 44:2, 44:4, 50:6, 50:9, 51:3
**drug-related** [1] - 29:24
**drugs** [46] - 4:11, 4:17, 5:2, 5:3, 11:22, 12:8, 12:17, 12:20, 12:21, 12:23, 14:7, 14:8, 14:20, 14:24, 15:10, 19:23, 19:24, 20:23, 21:3, 21:4, 21:13, 21:15, 22:8, 22:22, 23:19, 23:23, 25:11, 25:12, 25:13, 28:8, 40:7, 40:13, 40:14, 40:19, 41:6, 41:13, 41:14, 42:1, 43:3, 44:4, 46:21, 46:22, 49:16, 50:4
**Dubuque** [17] - 3:21, 3:22, 4:24, 5:9, 9:4, 11:5, 12:2, 19:6, 19:8, 28:19, 32:11, 33:16, 44:9, 44:16, 47:10, 49:25
**DUBUQUE** [1] - 1:2
**Durango** [3] - 19:5, 19:7, 19:18
**during** [15] - 4:14, 8:5, 9:12, 10:5, 10:19, 11:15, 11:16, 12:11, 14:14, 18:23, 20:15, 26:22, 27:5, 29:21, 35:1

# E

**e-mail** [2] - 38:13, 42:14
**early** [5] - 5:25, 7:22, 11:15, 11:21, 32:24
**east** [3] - 22:4, 22:5
**EASTERN** [1] - 1:2

**easy** [1] - 46:17
**effect** [1] - 31:13
**effectively** [1] - 42:2
**effects** [3] - 6:18, 31:10, 35:5
**efforts** [1] - 10:16
**either** [5] - 29:13, 29:19, 32:23, 34:24, 39:7
**EMILY** [1] - 1:6
**Emily** [13] - 2:5, 3:25, 4:2, 7:17, 11:14, 11:23, 19:17, 28:18, 29:21, 31:23, 32:10, 33:11, 46:19
**Emily's** [2] - 39:3, 47:7
**employed** [2] - 3:20, 18:18
**employment** [2] - 42:24, 50:2
**encounter** [1] - 19:13
**encountered** [2] - 23:17, 35:7
**end** [2] - 31:20, 33:24
**ended** [1] - 22:3
**ends** [1] - 42:1
**enforcement** [8] - 5:23, 6:1, 10:13, 14:9, 15:3, 25:22, 33:17, 41:16
**ensure** [1] - 51:19
**entire** [2] - 27:20, 42:13
**entitled** [1] - 52:23
**environment** [1] - 47:4
**equipped** [1] - 19:9
**ESQ** [2] - 1:13, 1:16
**evening** [3] - 7:22, 11:1, 14:10
**event** [1] - 35:17
**events** [3] - 7:21, 10:14, 40:25
**eventually** [6] - 8:15, 11:14, 14:24, 25:21, 26:2, 45:17
**evidence** [18] - 16:14, 38:7, 38:9, 39:22, 40:22, 41:8, 42:3, 48:5, 48:10, 48:15, 48:20, 49:18, 49:19, 49:21, 51:7, 51:11, 51:12, 51:14
**evil** [1] - 46:25
**exact** [3] - 7:21, 32:25, 42:1
**exactly** [3] - 9:5, 11:24, 50:21
**EXAMINATION** [10] - 3:15, 28:16, 34:12, 36:16, 37:4, 53:3, 53:4, 53:5, 53:6, 53:7
**examiner** [1] - 35:14
**excuse** [2] - 13:19, 41:18
**excuses** [1] - 14:23
**executed** [1] - 45:17
**exited** [1] - 21:9
**exiting** [1] - 12:24
**expecting** [2] - 12:23, 40:10
**experience** [4] - 4:19, 4:24, 27:14, 27:25

**experienced** [1] - 36:7
**expert** [2] - 35:6, 35:10
**explain** [1] - 49:1
**expose** [1] - 22:15
**extra** - 13:8, 13:9
**extreme** [2] - 22:13, 44:1

## F

**face** [1] - 10:6
**Facebook** [4] - 7:25, 8:25, 9:4, 9:6
**faces** [1] - 46:1
**facility** [1] - 50:21
**facing** [1] - 46:1
**fact** [7] - 31:12, 40:17, 41:16, 41:24, 42:23, 44:7, 51:25
**factor** [1] - 49:22
**factors** [2] - 39:25, 49:5
**facts** [2] - 46:6, 51:25
**failed** [4] - 44:15, 44:20, 44:21, 44:22, 51:1
**failing** [2] - 44:14, 44:24
**fails** [1] - 45:15
**failure** [3] - 44:18, 44:24, 45:20
**fairly** [3] - 43:15, 44:13, 50:10
**fallen** [1] - 27:8
**false** [1] - 44:5
**falsely** [1] - 44:7
**familiar** [6] - 4:2, 4:4, 4:5, 5:13, 10:10, 47:22
**family** [1] - 42:10
**far** [1] - 47:10
**fashion** [1] - 40:13
**fast** [1] - 41:10
**father** [4] - 38:16, 39:3, 42:12, 42:13
**favor** [2] - 40:9, 48:18
**favorable** [1] - 42:7
**February** [1] - 1:11
**federal** [3] - 33:8, 33:17, 33:23
**Federal** [1] - 1:10
**fell** [2] - 29:13, 29:16
**felons** [1] - 51:4
**felt** [1] - 47:18
**female** [2] - 9:17, 9:24
**fentanyl** [11] - 16:23, 16:25, 24:4, 24:13, 37:25, 40:2, 40:3, 40:4, 41:9, 41:13, 49:15
**few** [4] - 7:3, 7:6, 32:25, 42:9
**Fifth** [1] - 50:8
**fifth** [3] - 44:10, 45:19
**file** [1] - 52:3

**filed** [2] - 2:22, 33:8
**filing** [1] - 32:21
**finally** [3] - 14:10, 17:25, 18:5
**findings** [3] - 16:22, 24:12, 24:13
**fine** [2] - 3:14, 31:9
**fire** [1] - 6:2
**firearm** [2] - 49:11, 49:12
**first** [14] - 2:6, 2:19, 6:8, 6:11, 6:12, 6:20, 20:23, 33:21, 35:7, 40:23, 44:15, 46:2, 49:9, 51:8
**five** [4] - 6:10, 19:6, 20:7, 22:3
**flags** [1] - 44:1
**floorboard** [1] - 23:4
**foil** [1] - 30:15
**following** [2] - 2:1, 11:1
**footage** [2] - 41:3, 41:4
**FOR** [1] - 1:1
**Force** [4] - 3:23, 5:9, 11:5, 12:2
**force** [7] - 11:7, 12:22, 18:7, 18:17, 22:10, 33:16, 45:15
**forearm** [1] - 22:15
**foregoing** [2] - 52:13, 52:21
**forfeiture** [1] - 44:16
**formal** [1] - 3:1
**forms** [1] - 11:10
**forward** [1] - 41:11
**forwarded** [1] - 38:24
**four** [2] - 4:10, 20:7
**frankly** [2] - 40:8, 47:13
**front** [1] - 23:12
**function** [2] - 4:23, 46:17
**functioned** [1] - 4:23
**FURTHER** [2] - 37:4, 53:7
**future** [1] - 48:7

## G

**gap** [1] - 23:12
**garbage** [1] - 30:16
**gas** [1] - 14:1
**general** [2] - 50:1, 51:22
**generally** [2] - 7:19, 12:10
**girl** [1] - 26:3
**Girl** [1] - 26:4
**girlfriend** [3] - 5:24, 11:19, 18:22
**given** [6] - 12:19, 15:4, 27:17, 40:24, 45:12, 47:12
**glad** [1] - 49:11
**government** [8] - 2:14, 2:17, 48:13, 48:18, 49:2, 50:7, 51:8, 51:11
**gram** [2] - 8:21, 29:18
**grams** [6] - 27:7, 27:12,

27:19, 28:1, 29:5
**grand** [1] - 39:20
**guarantees** [1] - 42:18
**guess** [2] - 37:11, 38:12
**guilty** [1] - 48:8

## H

**habit** [3] - 40:8, 40:12, 51:3
**hair** [1] - 22:14
**half** [5] - 4:10, 8:21, 14:12, 14:14, 20:1
**hallway** [1] - 13:1
**hand** [3] - 3:6, 15:20, 22:17
**handed** [2] - 12:22, 14:6
**harm's** [1] - 47:8
**head** [1] - 49:2
**hear** [3] - 2:7, 48:4, 48:9
**HEARING** [1] - 1:6
**hearing** [10] - 2:6, 2:12, 2:16, 44:20, 44:21, 47:21, 47:24, 48:13, 52:12, 52:13
**Hearing** [1] - 1:9
**hearings** [2] - 48:7, 51:18
**held** [2] - 1:9, 42:23
**help** [1] - 1:9
**heroin** [34] - 4:18, 4:20, 4:23, 5:17, 7:16, 7:17, 8:18, 10:23, 11:8, 12:14, 14:22, 15:13, 15:15, 15:24, 15:25, 16:19, 21:25, 23:7, 26:3, 26:10, 26:18, 27:12, 27:13, 27:16, 27:21, 28:24, 29:11, 29:12, 29:15, 30:5, 46:16, 46:18, 46:20, 51:4
**heroin-like** [1] - 30:5
**herself** [5] - 19:23, 40:14, 40:20, 44:7, 46:23
**high** [5] - 21:18, 22:2, 25:15, 45:21, 46:5
**himself** [2] - 7:7, 19:1
**history** [8] - 13:7, 42:6, 43:21, 44:14, 49:24, 50:6, 50:9
**hold** [1] - 50:6
**Home** [1] - 26:4
**home** [1] - 50:19
**Honor** [15] - 2:8, 2:9, 2:13, 2:15, 2:19, 2:24, 34:11, 37:1, 38:5, 38:8, 39:9, 46:14, 47:18, 52:8, 52:11
**Honorable** [1] - 1:9
**hope** [1] - 47:25
**hospital** [3] - 7:8, 30:24, 30:25
**hour** [5] - 14:11, 14:12, 14:14
**hours** [6] - 5:25, 10:18, 10:19, 11:1, 11:15, 11:22
**house** [3] - 13:4, 19:21,

26:5
**hundred** [1] - 18:16

## I

**IA** [3] - 1:15, 1:18, 1:21
**idea** [1] - 45:5
**identification** [9] - 16:23, 16:25, 17:3, 17:5, 17:15, 24:5, 24:14, 24:23, 24:24
**identify** [1] - 17:7
**identifying** [1] - 44:7
**immediate** [1] - 45:6
**immediately** [2] - 33:19, 36:9
**implicate** [1] - 45:5
**important** [1] - 48:2
**impose** [1] - 51:17
**IN** [1] - 1:1
**incentive** [1] - 46:3
**incident** [18] - 5:7, 5:11, 17:17, 20:17, 23:21, 30:4, 30:22, 31:17, 32:20, 33:1, 33:12, 33:24, 34:1, 34:16, 35:8, 40:3, 41:11, 41:12
**inclined** [1] - 13:8
**including** [3] - 4:10, 47:10, 49:10
**independent** [1] - 41:3
**INDEX** [1] - 53:1
**indicated** [2] - 30:5, 48:23
**indicates** [1] - 43:2
**indication** [2] - 14:17, 25:16, 42:25
**indicative** [1] - 43:14
**indictment** [6] - 33:20, 34:2, 39:16, 39:20, 42:5, 49:21
**individual** [3] - 40:4, 40:7, 43:14
**influence** [1] - 25:18
**informant** [4] - 4:13, 12:5, 29:9
**information** [9] - 2:21, 8:23, 28:23, 29:3, 43:16, 43:23, 44:5, 45:21, 50:5
**inject** [2] - 15:24, 22:16
**injected** [2] - 16:1, 22:8
**injection** [1] - 22:1
**injury** [7] - 35:22, 36:3, 37:15, 37:17, 37:23, 39:15, 46:2
**innocent** [1] - 48:8
**inpatient** [1] - 50:21
**inside** [5] - 15:18, 16:14, 20:4, 20:6, 21:11
**instance** [2] - 12:11, 13:10
**instead** [1] - 29:11
**instrumentally** [2] - 24:5, 24:14

**insufficient** [9] - 16:23, 16:25, 17:3, 17:4, 17:14, 24:4, 24:13, 24:23, 24:24
**intending** [1] - 8:12
**intent** [1] - 39:13
**intention** [2] - 26:9, 28:7
**intentioned** [1] - 43:8
**interacting** [1] - 51:3
**interaction** [2] - 25:17, 49:22
**intersection** [4] - 9:25, 10:2, 14:2, 19:25
**interview** [1] - 7:12
**interviewed** [1] - 7:9
**investigator** [1] - 3:22
**involve** [2] - 44:4, 49:11
**involved** [4] - 12:1, 13:13, 43:2, 49:10
**involvement** [1] - 33:23
**involves** [2] - 40:2, 40:3
**involving** [3] - 40:1, 40:3, 41:2
**IOWA** [1] - 1:1
**Iowa** [10] - 1:10, 1:11, 19:5, 29:22, 39:3, 42:9, 42:10, 47:10, 50:1
**issue** [1] - 26:23
**issued** [1] - 45:17
**issues** [2] - 47:12, 47:14
**items** [1] - 16:17
**itself** [1] - 16:10

## J

**Jackson** [5] - 9:25, 10:1, 10:2, 22:5, 22:6
**January** [1] - 10:19
**job** [1] - 48:11
**jobs** [1] - 42:23
**John** [2] - 5:12, 5:13
**Joshua** [1] - 35:11
**judge** [1] - 52:2
**Judge** [2] - 1:9, 38:11
**July** [16] - 5:8, 5:25, 6:6, 9:19, 11:1, 11:15, 11:22, 17:17, 17:24, 31:18, 31:19, 31:20, 33:24, 41:12, 41:18, 44:22
**jury** [3] - 39:20, 48:1, 48:3
**jury's** [2] - 48:3, 48:9
**justice** [1] - 48:16

## K

**keep** [1] - 43:9
**kind** [2] - 49:2, 50:8
**kinnamon** [1] - 1:16
**Kinnamon** [1] - 1:16
**knowing** [1] - 47:8
**knowledge** [9] - 13:2,

28:21, 28:22, 31:9, 33:23, 34:22, 35:1, 35:17, 36:22
**known** [3] - 4:15, 29:21, 42:13
**knows** [2] - 26:4, 45:13

## L

**L-e-i-t-z-e-n** [1] - 3:19
**lab** [4] - 16:10, 16:15, 17:5, 37:7
**laboratory** [5] - 16:7, 17:10, 24:1, 24:8, 24:19
**lack** [2] - 12:7, 50:17
**laid** [1] - 9:6
**larger** [4] - 26:18, 28:25, 29:4, 29:15
**last** [6] - 3:18, 18:21, 20:24, 27:20, 28:19, 31:16
**lasting** [3] - 31:10, 31:12, 35:5
**late** [4] - 5:8, 32:23, 33:6, 34:4
**laudable** [1] - 50:19
**law** [8] - 5:23, 6:1, 10:12, 14:9, 15:3, 25:22, 33:17, 41:16
**lawyers** [1] - 47:22
**leading** [2] - 13:17, 25:22
**least** [8] - 14:11, 31:25, 32:16, 32:22, 33:12, 33:23, 41:19, 50:22
**leave** [3] - 3:14, 33:11, 50:8
**led** [3] - 32:6, 32:21, 33:13
**Leitzen** [3] - 3:4, 3:5, 3:19
**LEITZEN** [2] - 3:8, 53:3
**less** [1] - 48:2
**level** [3] - 5:4, 17:13, 28:23
**levels** [1] - 17:10
**license** [1] - 44:17
**life** [4] - 42:13, 43:1, 46:16, 47:4
**lifelong** [1] - 42:8
**light** [1] - 10:8
**likely** [1] - 36:4
**likewise** [1] - 41:24
**liquid** [3] - 16:14, 17:1, 24:19
**lit** [1] - 10:7
**lived** [3] - 28:19, 42:9, 47:13
**living** [1] - 30:16
**local** [1] - 12:14
**locate** [1] - 8:6
**located** [2] - 15:22, 30:17
**location** [5] - 8:13, 20:19, 41:5, 42:2, 43:6
**locations** [1] - 9:9
**locking** [1] - 50:13
**long-lasting** [2] - 31:10,

35:5
**long-time** [1] - 5:17
**look** [3] - 38:19, 42:6, 49:5
**looking** [1] - 39:25
**lost** [2] - 36:9, 37:12
**low** [2] - 5:4, 28:23
**low-level** [2] - 5:4, 28:23
**Luke's** [1] - 35:11

## M

**Magistrate** [1] - 1:9
**mail** [2] - 38:13, 42:14
**Main** [3] - 19:21, 19:25, 27:3
**maintaining** [1] - 18:19
**Majesty** [1] - 52:5
**mandatory** [1] - 46:1
**manner** [1] - 16:3
**Manson** [6] - 29:22, 39:3, 42:11, 47:10, 47:13, 47:14
**Mark** [1] - 1:9
**MARK** [1] - 1:16
**mask** [2] - 3:10, 6:13
**Matt** [1] - 1:19
**matter** [6] - 2:4, 2:6, 31:12, 51:19, 51:23, 52:23
**mean** [2] - 9:7, 46:16, 46:25
**meaning** [3] - 5:1, 6:21, 27:6
**means** [2] - 17:5, 49:2
**measures** [2] - 18:13, 19:4
**medical** [6] - 30:23, 31:1, 35:5, 35:10, 35:14, 36:3
**medium** [1] - 41:25
**meet** [5] - 8:12, 8:13, 11:14, 17:13, 17:25
**meeting** [1] - 8:23
**meetings** [1] - 10:14
**mention** [2] - 20:18, 37:17
**mentioned** [2] - 2:17, 20:12, 48:12
**message** [1] - 13:4
**messages** [11] - 8:6, 8:10, 8:11, 8:12, 8:14, 8:16, 8:18, 9:1, 10:25, 11:3, 41:1
**Messenger** [4] - 8:1, 8:25, 9:4, 9:6
**messy** [2] - 46:16, 47:4
**met** [7] - 8:7, 8:16, 10:20, 12:19, 18:12, 19:16, 48:18
**metal** [1] - 24:7
**methamphetamine** [2] - 14:21, 30:19
**methylenedioxymethamp
hetamine** [2] - 30:18, 37:18
**MEYER** [17] - 1:16, 2:9, 2:13, 2:24, 28:17, 34:7, 36:15, 36:17, 37:1, 38:5, 38:11, 38:21, 39:1, 39:9, 46:14, 52:8, 52:11, 53:4, 53:5, 53:6, 53:7, 53:8

52:11, 53:5, 53:7
**Meyer** [14] - 1:16, 2:10, 28:15, 34:9, 34:14, 36:14, 37:2, 38:4, 38:9, 45:3, 46:13, 47:19, 49:6, 52:10
**Meyer's** [1] - 40:6
**mid** [2] - 32:23, 32:24
**middler** [1] - 5:1
**middling** [1] - 43:3
**might** [3] - 17:14, 38:22, 47:23
**Milwaukee** [2] - 21:11, 26:5
**mimic** [1] - 10:22, 10:23
**minimum** [1] - 46:1
**minutes** [7] - 6:10, 7:3, 7:6, 15:1, 19:6, 20:7, 21:12
**Miranda** [1] - 25:4
**misdemeanor** [1] - 44:9
**Miss** [13] - 4:9, 10:21, 13:21, 13:22, 14:1, 14:5, 14:6, 14:7, 15:19, 19:6, 27:2, 38:16, 38:18
**missed** [1] - 27:8
**mistaken** [1] - 22:5
**modus** [1] - 40:19
**money** [13] - 5:3, 12:19, 14:8, 17:18, 19:22, 20:17, 20:19, 20:22, 20:23, 21:4, 41:22, 43:1, 46:21
**months** [6] - 29:8, 32:20, 32:22, 33:1, 33:12, 45:20
**morning** [6] - 5:25, 7:22, 10:24, 11:15, 11:21, 38:14
**most** [2] - 45:3, 47:20
**move** [1] - 22:12
**moved** [1] - 43:7
**moving** [2] - 22:14, 22:16
**MR** [34] - 2:8, 2:9, 2:13, 2:15, 2:19, 2:24, 3:3, 3:14, 3:16, 28:13, 28:17, 34:7, 34:11, 34:13, 36:12, 36:15, 36:17, 37:1, 37:5, 38:2, 38:5, 38:8, 38:11, 38:21, 39:1, 39:9, 46:14, 52:8, 52:11, 53:4, 53:5, 53:6, 53:7, 53:8

## N

**name** [3] - 3:17, 35:11, 36:19
**NARCAN** [7] - 6:14, 6:16, 6:17, 6:24, 7:4, 31:13, 37:20
**narrow** [1] - 43:10
**nature** [2] - 49:3, 49:9
**near** [1] - 30:6
**necessary** [1] - 47:18
**need** [1] - 50:23
**needed** [4] - 19:20, 21:18, 22:1, 22:11
**needle** [1] - 22:17

**needles** [1] - 21:23
**needs** [1] - 28:24
**negative** [1] - 11:11
**Nelson** [31] - 2:5, 3:25, 4:2, 4:5, 4:9, 4:14, 5:8, 7:17, 10:14, 10:21, 11:14, 11:23, 13:16, 13:22, 14:1, 14:6, 14:7, 19:6, 19:17, 19:20, 21:9, 21:22, 23:16, 27:2, 27:5, 28:4, 38:18, 43:9, 47:20, 51:24, 52:4
**NELSON** [1] - 1:6
**Nelson's** [2] - 38:16, 42:15
**never** [5] - 14:8, 47:12, 47:14, 48:3, 48:9
**next** [6] - 3:12, 15:16, 19:19, 20:8, 21:8, 43:7
**night** [3] - 7:10, 14:8, 15:6
**nights** [1] - 13:25
**nightstand** [2] - 15:16, 15:21
**nonappearance** [3] - 48:14, 50:25, 51:13
**none** [3] - 2:13, 30:1, 30:3
**nonlawyers** [1] - 49:1
**normally** [1] - 48:12
**north** [1] - 19:6
**northbound** [2] - 9:24, 10:1
**NORTHERN** [1] - 1:1
**Northern** [1] - 1:10
**nothing** [3] - 38:2, 38:5, 46:23
**notice** [1] - 3:2
**November** [7] - 32:16, 32:24, 33:6, 33:7, 34:4, 45:16, 45:17
**Number** [1] - 2:5
**number** [2] - 2:22, 44:3
**numerous** [1] - 18:17

## O

**objection** [3] - 2:10, 2:14, 2:23
**observe** [2] - 9:8, 9:17
**observed** [1] - 26:6
**obtain** [3] - 8:19, 28:8, 51:4
**obvious** [4] - 47:25, 48:2, 49:15, 50:10
**obviously** [3] - 25:10, 49:14, 49:25
**occasions** [1] - 4:9
**occur** [1] - 29:19
**occurred** [8] - 7:20, 10:18, 11:24, 17:23, 32:4, 41:12, 45:20, 46:2
**October** [3] - 32:23, 33:7, 34:4
**OF** [3] - 1:1, 1:3, 1:6
**offense** [3] - 39:12, 45:25,

49:10
**offenses** [2] - 39:13, 39:23
**offered** [1] - 27:7
**office** [5] - 10:20, 11:7, 12:22, 38:24, 50:5
**officer** [3] - 3:11, 3:21, 28:18
**officers** [4] - 22:13, 22:16, 22:17, 26:6
**old** [3] - 27:6, 42:24
**once** [7] - 14:3, 14:25, 20:19, 20:20, 30:25, 41:19
**one** [10] - 12:14, 12:23, 13:12, 30:14, 36:15, 39:7, 43:6, 46:23, 47:24
**onset** [1] - 36:6
**operandi** [1] - 40:19
**operation** [2] - 15:2, 22:11
**opine** [1] - 37:14
**opined** [1] - 37:16
**opinion** [4] - 35:21, 36:1, 36:2, 36:21
**opioid** [5] - 6:17, 6:18, 37:16, 37:24, 41:9
**opioids** [2] - 37:21
**opportunity** [2] - 27:8, 45:12
**option** [1] - 50:18
**order** [5] - 11:13, 19:22, 28:25, 51:4, 51:21
**outfitted** [1] - 18:15
**outline** [2] - 40:25, 41:1
**overdose** [12] - 5:12, 5:22, 6:18, 7:18, 10:18, 15:7, 15:8, 31:17, 35:8, 35:17, 37:19, 37:22
**overdosed** [6] - 5:20, 6:1, 11:23, 30:5, 30:7, 30:22
**own** [6] - 7:4, 21:3, 27:23, 31:2, 31:14, 40:8

## P

**p.m** [2] - 1:11, 52:14
**PAGE** [1] - 53:2
**page** [1] - 44:6
**Pape** [1] - 22:10
**paragraph** [3] - 44:6, 44:22, 45:2
**paragraphs** [1] - 44:19
**paramedics** [1] - 6:24
**paraphernalia** [5] - 4:12, 15:10, 15:11, 22:25, 44:5
**park** [2] - 20:12, 20:14
**parked** [8] - 9:21, 9:22, 10:4, 13:24, 14:5, 20:1, 20:20, 22:6
**parking** [4] - 19:7, 20:2, 20:13, 22:4
**partially** [1] - 41:20

**particular** [6] - 5:7, 17:10, 17:11, 37:15, 39:13, 42:18
**particularly** [2] - 43:25, 46:18
**parties** [1] - 2:25
**parts** [1] - 20:13
**party** [1] - 39:7
**passenger** [4] - 23:4, 23:9, 23:11
**past** [2] - 4:10, 51:2
**pattern** [1] - 41:24
**pending** [1] - 48:12
**people** [13] - 5:2, 40:12, 40:15, 40:20, 43:5, 46:15, 47:1, 49:1, 50:7, 50:12, 50:13
**perceived** [1] - 45:7
**perhaps** [1] - 45:3
**period** [2] - 17:22, 18:2
**periods** [1] - 27:22
**person** [5] - 19:9, 23:23, 42:1, 46:22, 49:12
**personally** [1] - 7:12
**personnel** [1] - 6:2
**phone** [6] - 8:2, 8:3, 8:5, 13:5, 41:2, 47:10
**photo** [1] - 26:4
**physically** [1] - 31:8
**pick** [3] - 19:22, 29:11, 29:15
**picked** [6] - 9:1, 13:21, 19:6, 32:18, 32:24, 33:2
**picture** [1] - 37:21
**place** [5] - 7:22, 11:13, 20:10, 22:2, 30:6
**Plaintiff** [1] - 1:4, 1:13
**PLAINTIFF'S** [1] - 3:8
**planning** [1] - 26:11
**plastic** [3] - 15:17, 16:13, 23:5
**Platteville** [1] - 29:10
**plug** [1] - 27:6
**plunge** [1] - 22:17
**point** [6] - 13:20, 20:15, 22:12, 22:19, 39:10, 41:22
**pointed** [1] - 26:4
**police** [4] - 3:21, 18:18, 23:17, 44:8
**portion** [1] - 5:3
**pose** [3] - 48:6, 51:2, 51:6
**poses** [3] - 49:17, 51:13, 51:14
**position** [1] - 47:24
**positive** [3] - 16:22, 30:17, 37:20
**possession** [2] - 39:13, 44:4
**possibility** [2] - 29:5, 29:18
**possible** [1] - 11:24

**post** [1] - 34:21
**posted** [1] - 34:23
**posting** [1] - 32:16
**potentially** [2] - 28:8, 45:14
**powdery** [1] - 15:18
**power** [1] - 43:9
**precautionary** [2] - 18:12, 19:3
**precautions** [1] - 13:8
**prepare** [1] - 15:25
**prepared** [1] - 2:1
**preparing** [3] - 21:25, 22:8
**preponderance** [2] - 48:15, 51:12
**present** [6] - 1:19, 9:12, 9:16, 17:9, 17:7, 18:22, 48:6
**presented** [2] - 39:22, 46:7
**presents** [1] - 50:15
**preserialized** [1] - 18:16
**presumably** [1] - 46:21
**presumption** [7] - 39:11, 39:17, 39:24, 48:22, 48:25, 49:8, 51:9
**pretrial** [13] - 2:21, 32:8, 34:25, 38:14, 40:11, 42:22, 43:11, 43:17, 43:22, 44:6, 44:23, 44:25, 45:16
**pretty** [2] - 31:12, 31:14
**previously** [3] - 12:1, 12:4, 12:7
**primarily** [1] - 28:18
**probable** [2] - 39:11, 39:22
**Probation** [1] - 1:19
**probation** [1] - 50:5
**problem** [6] - 14:19, 42:17, 43:15, 43:25, 50:11, 50:23
**problems** [5] - 29:22, 29:23, 29:24, 30:2, 47:11, 50:14
**proceed** [2] - 2:18, 39:6
**proceedings** [3] - 45:23, 47:23, 52:23
**professionals** [1] - 36:4
**proffer** [2] - 38:7, 38:10
**prolonged** [1] - 49:25
**proposal** [1] - 47:3
**propose** [2] - 38:17, 39:4
**proposing** [1] - 43:22
**prosecution** [1] - 45:2
**prospect** [1] - 28:5
**prove** [1] - 48:19
**proven** [1] - 48:8
**provide** [1] - 8:2
**provided** [4] - 8:23, 11:11, 18:16, 37:6
**provides** [1] - 39:22
**providing** [1] - 44:5
**proving** [2] - 48:14, 49:4
**Pruitt** [7] - 35:11, 35:14,

35:16, 36:18, 36:19, 37:6, 37:10
**Pruitt's** [1] - 35:19
**pull** [1] - 22:14
**pulling** [1] - 22:18
**purchase** [5] - 11:8, 12:13, 12:20, 14:6, 21:6
**purchased** [8] - 7:16, 10:22, 11:22, 12:21, 12:23, 22:1, 26:2, 26:3
**purchasing** [1] - 12:18
**purported** [3] - 15:15, 16:19, 26:10
**purposes** [2] - 2:12
**put** [2] - 15:21, 47:4
**puts** [1] - 40:12
**putting** [2] - 40:20, 47:7

## Q

**quantity** [5] - 26:18, 27:12, 28:1, 28:9, 29:1
**questions** [7] - 28:13, 34:7, 34:14, 36:12, 39:2, 43:21, 45:4
**quickly** [1] - 31:14

## R

**raise** [1] - 3:6
**ran** [1] - 41:21
**rapid** [1] - 36:5
**Rapids** [3] - 1:11, 1:15, 1:18
**rather** [1] - 21:3
**RDR** [2] - 1:20, 52:24
**reach** [1] - 18:5
**reached** [1] - 21:23
**reaches** [1] - 41:25
**reaction** [1] - 37:20
**read** [2] - 8:25, 25:4
**real** [1] - 42:25
**really** [2] - 46:16, 50:10
**reasonable** [1] - 45:10
**reasonably** [3] - 39:18, 45:11, 46:9
**reasons** [1] - 13:12
**rebuttable** [5] - 39:11, 39:16, 39:24, 48:22, 48:25
**rebutted** [1] - 51:9
**received** [2] - 16:16, 17:5
**reconstruct** [2] - 41:17, 41:19
**record** [4] - 3:18, 43:13, 49:13
**recorded** [1] - 26:16
**recorder** [1] - 19:10
**recording** [7] - 1:20, 2:2, 11:12, 18:15, 52:16, 52:23
**recordings** [1] - 5:6

**recover** [1] - 15:3
**RECROSS** [2] - 36:16, 53:6
**RECROSS-EXAMINATION** [2] - 36:16, 53:6
**red** [1] - 44:1
**redirect** [1] - 34:10
**REDIRECT** [4] - 34:12, 37:4, 53:5, 53:7
**redistribute** [1] - 28:2
**reduction** [1] - 36:10
**reemerges** [1] - 10:2
**referring** [1] - 21:23
**reflected** [2] - 44:18, 44:22
**regard** [1] - 10:17
**regarding** [2] - 33:24, 38:15
**regardless** [1] - 49:7
**regular** [1] - 51:4
**regularly** [1] - 4:20
**related** [5] - 29:24, 34:19, 35:6, 35:16, 45:1
**release** [4] - 40:11, 42:7, 43:11, 43:25
**released** [5] - 38:18, 39:4, 40:10, 43:22, 48:11
**releasing** [1] - 47:16
**relied** [1] - 50:3
**remainder** [1] - 42:21
**remained** [1] - 32:15
**remaining** [2] - 26:10, 45:7
**remarks** [1] - 47:20
**remember** [1] - 25:14
**removed** [1] - 21:24
**rendered** [1] - 36:21
**repeat** [1] - 32:7
**report** [12] - 2:21, 6:3, 17:5, 17:11, 32:8, 35:19, 37:10, 37:14, 38:15, 42:22, 43:17, 44:7
**reported** [1] - 17:14
**reports** [2] - 35:16, 37:7
**request** [2] - 18:3, 43:20
**required** [3] - 45:24, 46:10, 51:18
**residence** [1] - 30:11
**resides** [1] - 39:4
**residue** [1] - 15:18
**respect** [4] - 15:13, 16:19, 34:14, 37:6
**respond** [2] - 11:3, 15:1
**responded** [2] - 6:2, 17:25
**responders** [5] - 6:8, 6:11, 6:12, 6:20, 35:8
**responding** [1] - 14:24
**result** [1] - 40:16
**resulted** [1] - 44:12
**resulting** [1] - 39:15

**results** [5] - 11:11, 16:16, 16:20, 24:3, 24:22
**return** [2] - 14:17, 14:23
**returned** [8] - 12:22, 13:1, 14:3, 14:8, 20:9, 21:12, 27:3, 39:20
**reverses** [2] - 6:17, 37:20
**review** [1] - 35:16, 42:14
**reviewed** [3] - 3:1, 19:12, 35:19
**revoked** [1] - 44:17
**rights** [1] - 25:4
**rinse** [3] - 16:11, 17:1, 24:16
**risk** [8] - 22:13, 45:21, 48:7, 48:14, 50:16, 50:25, 51:2, 51:13
**Roberts** [1] - 1:9
**room** [1] - 30:16
**route** [1] - 46:4
**rules** [2] - 47:9, 47:17
**run** [1] - 47:11
**Russo** [1] - 1:16

## S

**s/Shelly** [1] - 52:24
**safe** [1] - 22:2
**safety** [3] - 39:19, 46:10, 51:19
**sample** [1] - 17:11
**save** [1] - 27:22
**scales** [2] - 48:16, 48:17
**scene** [3] - 6:2, 6:9, 41:8
**sculpture** [1] - 48:16
**search** [4] - 8:2, 8:5, 13:3, 15:7
**searched** [5] - 11:10, 18:14, 22:20, 23:21
**seat** [4] - 23:9, 23:11, 23:16
**seated** [1] - 3:9
**Second** [1] - 1:17
**second** [4] - 12:25, 15:6, 23:14, 44:18
**secure** [1] - 50:21
**see** [10] - 3:7, 9:11, 9:12, 10:6, 19:15, 22:7, 22:14, 48:16, 49:13, 51:5
**seem** [1] - 25:17
**sell** [1] - 46:22
**selling** [2] - 26:11, 43:3
**sells** [1] - 29:1
**Semmler** [3] - 1:20, 52:24, 52:24
**sent** [7] - 16:6, 16:10, 16:15, 24:1, 24:7, 24:19, 38:13
**separate** [1] - 12:18
**September** [2] - 31:25, 44:15

**sequence** [1] - 10:13
**Sergeant** [1] - 22:9
**serious** [9] - 35:22, 36:2, 37:17, 37:22, 39:15, 40:5, 45:25, 50:11, 50:23
**seriously** [2] - 47:6, 47:16
**services** [6] - 2:21, 32:8, 38:15, 42:22, 43:17, 44:6
**set** [12] - 10:22, 11:8, 12:12, 12:13, 13:15, 17:19, 18:2, 18:7, 18:11, 29:14, 31:22, 41:11
**setting** [2] - 10:14, 29:7
**seven** [3] - 28:1, 29:5, 29:18
**seven-gram** [1] - 29:18
**Seventh** [2] - 1:10, 1:14
**several** [12] - 4:9, 8:11, 8:13, 13:3, 14:16, 14:22, 15:1, 18:1, 28:19, 29:8, 33:12, 43:7
**severe** [2] - 36:6, 43:14
**shallow** [1] - 6:22
**sharing** [2] - 49:16, 51:5
**sharps** [1] - 16:11
**Shelly** [2] - 1:20, 52:24
**short** [3] - 7:6, 7:17, 31:12
**short-lasting** [1] - 31:12
**shortly** [1] - 31:15
**shot** [3] - 21:19, 21:20, 21:22
**showing** [2] - 48:7, 51:12
**shown** [1] - 42:21
**shows** [1] - 41:4
**sic** [1] - 18:2
**side** [3] - 23:4, 23:8, 23:9
**sight** [1] - 10:1
**signature** [1] - 34:24
**significant** [4] - 27:13, 36:10, 44:2, 50:2
**significantly** [1] - 25:18
**similar** [2] - 41:22, 41:24
**simply** [1] - 40:2
**simultaneously** [1] - 43:22
**Sioux** [1] - 1:21
**sitting** [1] - 3:12
**situation** [1] - 43:6
**six** [2] - 6:10, 22:3
**Sixth** [1] - 1:20
**slightly** [1] - 48:17
**small** [5] - 16:13, 23:4, 23:5, 23:11, 23:13
**society** [1] - 46:17
**someone** [4] - 4:19, 5:13, 28:1, 47:24
**sometimes** [1] - 48:16
**somewhat** [5] - 5:16, 43:14, 43:18, 50:9
**soon** [1] - 31:13

**sorry** [1] - 32:7
**sort** [5] - 10:13, 36:5, 38:14, 43:7, 44:19
**sounded** [1] - 29:12
**south** [1] - 22:3
**southbound** [1] - 10:3
**Southeast** [3] - 1:10, 1:14, 1:17
**specific** [1] - 29:25
**specifically** [3] - 15:13, 35:10, 51:1
**speculating** [1] - 50:9
**speculative** [1] - 50:10
**spell** [1] - 3:17
**split** [1] - 12:17
**spoken** [1] - 5:5
**spoon** [8] - 15:22, 16:2, 16:5, 16:24, 22:9, 23:7, 24:7
**sporadic** [2] - 42:24, 43:4
**squeezed** [1] - 16:13
**St** [1] - 35:11
**start** [2] - 39:10, 49:2
**stash** [1] - 27:23
**state** [8] - 3:17, 7:23, 26:8, 33:3, 33:7, 34:19, 34:25, 42:9
**statement** [2] - 26:17, 42:15
**statements** [1] - 25:8
**STATES** [2] - 1:1, 1:3
**States** [8] - 1:9, 1:14, 2:5, 2:20, 3:3, 3:25, 18:17, 52:7
**stating** [4] - 8:7, 22:1, 26:6, 28:7
**station** [1] - 14:1
**stayed** [2] - 34:5, 43:5
**steady** [1] - 42:23
**stealing** [1] - 46:20
**stepfather** [6] - 42:11, 42:19, 47:5, 47:14, 47:17, 50:19
**steps** [3] - 8:22, 10:12, 13:1
**still** [1] - 48:2
**stolen** [1] - 12:8
**Stoney** [6] - 5:24, 11:19, 13:12, 13:21, 14:5, 15:19
**stop** [3] - 4:11, 14:1, 22:11
**stopped** [1] - 14:24
**stopping** [1] - 4:11
**store** [1] - 20:13
**straight** [1] - 43:10
**strange** [1] - 47:23
**street** [2] - 10:8, 33:12
**Street** [14] - 1:17, 1:20, 9:20, 9:24, 13:24, 14:5, 19:22, 20:13, 20:20, 21:11, 22:6, 26:6, 27:3, 27:5
**strength** [1] - 48:4
**strict** [1] - 47:9

**strong** [2] - 40:23, 42:3
**strongly** [1] - 49:19
**Sturdevant** [3] - 1:19, 38:13, 38:23
**substance** [14] - 16:6, 17:7, 17:8, 23:6, 23:25, 24:25, 25:2, 30:6, 32:11, 39:14, 39:15, 40:1, 40:2, 43:21
**substances** [3] - 30:12, 36:22, 37:7, 46:18, 46:20
**suffer** [1] - 36:2
**suffered** [4] - 35:22, 36:4, 36:9, 37:15
**Suite** [1] - 1:17
**supervision** [2] - 34:25, 43:23
**supplement** [1] - 38:14
**support** [1] - 40:8
**supported** [1] - 40:12
**suppose** [1] - 3:12
**surprising** [1] - 46:19
**surrounding** [1] - 37:19
**surveillance** [3] - 18:18, 18:19, 21:10
**suspected** [5] - 5:19, 5:20, 5:22, 21:25, 23:6
**suspended** [1] - 44:17
**SWORN** [1] - 3:8
**sympathy** [1] - 46:24
**syringe** [14] - 15:19, 16:1, 16:9, 16:10, 16:11, 16:12, 16:13, 16:15, 17:1, 23:10, 23:14, 24:16, 30:14
**syringes** [1] - 21:24

**T**

**table** [1] - 3:7
**tan** [1] - 23:6
**task** [7] - 11:7, 12:22, 18:7, 18:17, 22:10, 33:16, 45:15
**Task** [4] - 3:23, 5:9, 11:5, 12:2
**tellingly** [1] - 45:3
**tend** [1] - 49:5
**tended** [1] - 8:6
**terms** [2] - 49:18, 49:20
**test** [1] - 30:21
**tested** [5] - 16:22, 24:10, 24:20, 30:17, 30:20
**testified** [1] - 26:16
**testify** [1] - 3:6
**testimony** [3] - 26:19, 43:2, 43:16
**testing** [4] - 16:16, 16:21, 24:3, 24:22
**text** [2] - 8:16, 13:4
**th** [1] - 44:10
**THE** [27] - 1:1, 1:1, 2:4, 2:10, 2:14, 2:16, 2:23, 2:25,

3:5, 3:9, 3:10, 3:11, 28:14, 34:9, 36:13, 37:2, 38:3, 38:6, 38:9, 38:19, 38:25, 39:6, 46:12, 47:19, 52:5, 52:6, 52:9
**theft** [5] - 44:4, 44:8, 44:9, 44:10, 44:11
**theirself** [1] - 28:25
**theme** [1] - 44:13
**themselves** [2] - 27:19, 47:2
**thereby** [1] - 40:20
**therefore** [1] - 51:21
**thinking** [1] - 26:15
**third** [1] - 44:11
**three** [2] - 21:12, 45:20
**throughout** [2] - 4:10, 44:13
**tie** [1] - 22:14
**ties** [1] - 49:25
**timeline** [3] - 9:1, 9:3, 9:6
**tinfoil** [1] - 30:16
**tip** [1] - 48:17
**today** [5] - 39:22, 43:16, 46:7, 49:6, 52:3
**took** [5] - 7:22, 12:25, 17:18, 31:13, 47:5
**totality** [2] - 51:7, 51:10
**tough** [1] - 48:25
**toward** [1] - 10:4
**towards** [2] - 20:2, 27:4
**town** [2] - 27:7, 35:12
**towns** [1] - 42:10
**traffic** [8] - 4:11, 9:5, 9:22, 10:6, 10:9, 41:3, 41:18
**transaction** [2] - 7:19, 41:9
**Transcribed** [1] - 1:20
**TRANSCRIPT** [1] - 1:6
**transcript** [3] - 2:1, 52:16, 52:22
**transported** [4] - 7:8, 19:7, 29:14, 31:5
**treatment** [4] - 30:23, 31:1, 50:18
**trial** [5] - 47:25, 48:3, 48:12, 51:18, 51:22
**tried** [3] - 10:21, 18:1, 29:7
**trip** [1] - 27:5
**trusting** [1] - 20:19
**truthful** [1] - 25:10
**try** [4] - 10:13, 10:21, 10:22, 50:11
**trying** [1] - 29:14
**turned** [1] - 29:11
**turning** [3] - 6:21, 49:24, 50:25
**twice** [2] - 41:19, 41:20
**two** [9] - 8:12, 8:15, 11:24, 12:18, 14:16, 18:1, 21:24,

23:13, 32:3
**two-week** [1] - 18:1
**types** [2] - 14:23, 37:10
**typical** [2] - 27:16, 27:18
**typically** [1] - 4:18

**U**

**U.S** [2] - 1:19, 33:17
**unbeknownst** [1] - 12:15
**unconscious** [4] - 6:21, 7:10, 15:17, 15:20
**under** [6] - 21:10, 25:18, 34:25, 39:10, 47:15, 50:20
**undercover** [5] - 11:8, 12:13, 15:2, 18:3, 22:11
**UNITED** [2] - 1:1, 1:3
**United** [8] - 1:9, 1:14, 2:5, 2:20, 3:3, 3:24, 18:17, 52:7
**units** [1] - 18:18
**University** [1] - 13:22
**unused** [1] - 23:15
**up** [41] - 3:11, 8:12, 9:2, 10:7, 10:14, 10:22, 11:9, 11:14, 12:12, 12:13, 13:22, 14:22, 15:6, 15:25, 16:12, 17:19, 17:24, 18:2, 18:8, 18:11, 19:6, 19:22, 22:3, 22:14, 25:22, 26:23, 27:19, 29:7, 29:11, 29:14, 29:15, 30:20, 31:22, 32:18, 32:24, 33:2, 41:11, 41:22, 42:1, 48:7, 50:13
**user** [7] - 4:15, 5:17, 27:16, 27:18, 40:17, 46:23, 46:25
**users** [1] - 27:21
**uses** [3] - 4:19, 40:7, 40:13

**V**

**valve** [1] - 6:13
**vehicle** [20] - 9:8, 9:13, 10:4, 10:6, 11:9, 14:4, 18:14, 18:20, 20:9, 20:21, 21:9, 21:13, 22:18, 22:20, 22:22, 23:19, 25:9, 25:22, 27:3, 41:5
**veins** [1] - 22:15
**ventilations** [2] - 6:13, 7:5
**versus** [2] - 2:5, 3:25
**via** [1] - 7:25
**video** [8] - 2:11, 3:7, 9:5, 9:22, 10:7, 19:9, 19:12, 49:21
**videos** [2] - 10:10, 35:16
**view** [2] - 50:22, 51:25
**viewed** [2] - 9:4, 10:9
**violation** [1] - 32:11
**violence** [2] - 49:11, 49:12
**violent** [1] - 49:12

**visual** [1] - 18:19
**void** [3] - 23:11, 23:13, 23:14
**vs** [1] - 1:5

## W

**wait** [1] - 14:9
**Walgren** [62] - 5:12, 5:13, 5:19, 6:12, 6:15, 7:4, 7:9, 7:13, 8:7, 8:14, 8:19, 8:23, 9:8, 10:4, 10:20, 11:7, 11:16, 12:1, 12:12, 12:13, 12:19, 13:7, 13:18, 13:19, 13:21, 14:14, 14:20, 15:17, 17:19, 18:1, 18:2, 18:12, 19:1, 19:5, 19:9, 19:15, 19:20, 19:24, 20:16, 20:22, 21:5, 21:20, 22:2, 23:21, 26:12, 26:22, 27:5, 28:4, 28:7, 30:4, 30:20, 35:21, 36:6, 37:11, 37:15, 40:24, 41:6, 41:10, 41:25, 46:3, 49:16, 49:22
**Walgren's** [19] - 6:19, 6:25, 9:18, 10:5, 15:7, 15:20, 18:19, 18:22, 20:9, 21:4, 21:9, 21:13, 27:3, 35:4, 35:6, 35:17, 36:23, 41:2, 41:5
**walk** [3] - 7:7, 9:17, 10:5
**walked** [4] - 20:2, 21:10, 31:2, 31:3
**walks** [3] - 9:24, 9:25, 10:3
**wall** [1] - 48:17
**warrant** [4] - 13:3, 32:19, 33:4, 45:16
**water** [1] - 16:12
**week** [1] - 18:1
**weeks** [1] - 32:3
**weighs** [1] - 49:23
**weight** [3] - 40:22, 49:18, 49:19
**west** [1] - 22:5
**White** [6] - 9:20, 13:24, 14:5, 20:13, 20:20, 27:4
**white** [1] - 9:23
**wife** [1] - 47:6
**willing** [2] - 47:8, 47:15
**wire** [3] - 11:12, 18:15, 22:7
**WITNESS** [3] - 3:8, 3:10, 53:2
**witness** [1] - 45:4
**witnesses** [1] - 5:5
**wondering** [2] - 8:15, 33:22
**word** [1] - 12:8
**world** [1] - 4:23
**worth** [2] - 11:8, 29:11

## Y

**year** [1] - 44:24

**years** [4] - 4:10, 28:20, 42:24, 43:7